THE HONORABLE KAREN A. OVERSTREET

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

IN RE HARRY R. YOURIST and
ROSALIE H. YOURIST,

               Debtors.

NO. 13-13512

Chapter 11

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION

Harry R. Yourist and Rosalie H Yourist, the Debtors in the above captioned Chapter 11 proceeding (the "Yourists" or the "Debtosr"), propose the following Plan of Reorganization (the "Plan") pursuant to Chapter 11 of the Bankruptcy Code:

# ARTICLE 1.

## DEFINITION OF TERMS

Unless the context requires otherwise, the following terms shall have the following meanings when used in initially capitalized form in the Plan. Such meanings shall be equally applicable to both the singular and plural forms of such terms. Any term used in capitalized form that is not defined in the Plan but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 1

MPBA{00565297-1}

ascribed to such term by the Bankruptcy Code or the Bankruptcy Rules (with the Bankruptcy Code controlling in the case of a conflict or ambiguity). The rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in construction of the Plan. All references to the "Plan" herein shall be construed, where applicable, to include references to this document and all its exhibits, appendices, schedules and annexes (and any amendments thereto made in accordance with the Bankruptcy Code).

1.1. "Administrative Expense" means (a) any cost or expense of administration of the Reorganization Case under Section 503(b) of the Bankruptcy Code including, but not limited to (1) any actual and necessary post-petition cost or expense of preserving the Estate or operating the business of the Debtor, (2) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (3) any post-petition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtor in the ordinary course of business, and (4) compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court under Sections 330(a) or 331 of the Bankruptcy Code, and (b) any fee or charge assessed against the Estate under 28 U.S.C. § 1930.

1.2. "Administrative Claim" means any claim for the payment of an Administrative Expense.

1.3. "Allowed Claim" means, with respect to any Claim or Interest, (a) any Claim or Interest, proof of which was timely filed with the Bankruptcy Court or its duly appointed claims agent, or, by order of the Bankruptcy Court, was not required to be filed, or (b) any Claim or Interest that has been, or hereafter is, listed in the Schedules as liquidated in amount and not disputed or contingent, and, in (a) and

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 2

MPBA{00565297-1}

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 2 of 98

(b) above, as to which either (1) no objection to the allowance thereof has been filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or (2) the Claim or Interest has been allowed by a Final Order (but only to the extent so allowed).

1.4. "Allowed Amount" means the dollar amount in which a Claim is Allowed.

1.5. "Bankruptcy Code" or "Code" means the Bankruptcy Code enacted November 6, 1978, as set forth in Title 11 of the United States Code, and as amended thereafter.

1.6. "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Western District of Washington, at Seattle, before which the Reorganization Case is pending, or if that Court ceases to exercise jurisdiction over the Bankruptcy Case, or as the context requires, the District Court.

1.7. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Case.

1.8. "Claim" means any claim against the Debtors as defined in Section 101(5) of the Bankruptcy Code.

1.9. "Confirmation" or "Confirmation of the Plan" means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

1.10. "Confirmation Date" means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

1.11. "Confirmation Hearing" means the hearing(s) which will be held before the Bankruptcy Court in which the Plan Proponents will seek Confirmation of the Plan.

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 3

MPBA{00565297-1}

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 3 of 98

1.12. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 and other applicable sections.

1.13. "Debtors" mean Harry R. Rourist and Rosalie H Yourist, which may also be referred to as "Yourist", whether acting in their capacity as debtors, debtors-in-possession, or Reorganized Debtors.

1.14. "Debtor in Possession" means Yourist.

1.15. "Disclosure Statement" means the Disclosure Statement dated July __, 2013, as submitted by the Plan Proponent pursuant to Section 1125 of the Bankruptcy Code and approved by the Bankruptcy Court, as such Disclosure Statement may be further amended, supplemented or modified from time to time.

1.16. "Disputed Claim" means any Claim for which a filed or scheduled claim of an alleged creditor was listed in the Debtor's schedules as "disputed" or that has not been allowed by a Final Order as to which (a) a Proof of Claim has been filed with the Bankruptcy Court or its duly appointed claims agent, or is deemed filed under applicable law or order of the Bankruptcy Court, and (b) an objection has been or may be timely filed or deemed filed under applicable law and any such objection has not been (1) withdrawn, (2) overruled or denied by a Final Order or (3) granted by a Final Order. For purposes of the Plan, a Claim that has not been Allowed by a Final Order shall be considered a Disputed Claim, whether or not an objection has been or may be timely filed, if (A) the amount of the Claim specified in the Proof of the Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, (B) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim scheduled in the Schedules, (C) any corresponding Claim has been scheduled in the Schedules as disputed, contingent or unliquidated,

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 4

MPBA{00565297-1}

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 4 of 98

(D) no corresponding Claim has been scheduled in the Schedules or (E) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof.

1.17 "Effective Date" means the date on which the Confirmation Order becomes a Final Order.

1.18. "Estate" means the bankruptcy estate of the Debtors created pursuant to Section 541 of the Bankruptcy Code.

1.19. "Final Order" means an order or judgment of the Court as to which the time for appeal has expired without a notice of appeal having been filed or as to which any appeal therefrom has been resolved. Notwithstanding the foregoing, with respect to the Confirmation Order, an order approving a claim, and any order approving a disclosure statement to accompany the Plan, "Final Order" means such order so long as no stay of such order is in effect.

1.20. "Petition Date" means the date upon which the Debtor filed its Chapter 11 Petition herein, which was April 17, 2013.

1.21. "Plan" means this Plan of Reorganization in its present form or as it may be amended or modified from time to time pursuant to order of the Bankruptcy Court where applicable.

1.22. "Plan Documents" means all documents, attachments and exhibits, and any amendments thereto made in accordance with the Bankruptcy Code, that aid in effectuating the Plan.

1.23. "Plan Proponent" means the Debtors.

1.24. "Priority Claim" means any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a)(7) of the Bankruptcy Code.

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 5

MPBA{00565297-1}

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 5 of 98

1.25. "Priority Tax Claims" means Allowed Claims of governmental units for the principal amount of a tax within the meaning of Section 507(a)(8) of the Code.

1.26. "Pro Rata" means proportionally so that the ratio of the amount distributed on account of a particular Allowed Claim or Interest to the amount of such Allowed Claim or Interest is the same as the ratio of the amount distributed on account of all Allowed Claims or Interests in the Class of which such particular Allowed Claim or Interest is a member to the total amount of all Allowed Claims or Interests in such Class.

1.27. "Proof of Claim" means any proof of claim filed with the Bankruptcy Court or its duly appointed claims agent with respect to the Debtor pursuant to Bankruptcy Rules 3001 or 3002.

1.28. "Schedules" means the Schedules, Statements and Lists filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been and may be amended or supplemented from time to time.

1.29. "Secured Claim" means any Claim that is (a) secured in whole or part, as of the Petition Date, by a lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value, net of senior Liens, of the particular Estate's interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

1.30. "Creditors Committee" means the Official Committee of Unsecured Creditors of the Debtor appointed by the United States Trustee (no Creditors Committee was appointed in the case).

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 6

MPBA{00565297-1}

1.31. "Unclassified Claims" means an allowed claim described in Section 507(a)(1) or (a)(8) of the Bankruptcy Code or as delineated in the Plan.

1.32. "United States Trustee" means the United States Trustee for the Western District of Washington.

1.33. "Unsecured Claim" means any Claim (regardless of whether such Claim is covered by insurance) that is neither secured nor entitled to priority under the Bankruptcy Code or by a Final Order of the Bankruptcy Court, including, but not limited to: (a) any claim arising from the rejection of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, and (b) any portion of a Claim to the extent that the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code.

1.34 "Shoreline Station Property" means the three separate parcels of real property owned by the Debtors that are located at 17255 Aurora Ave N, Shoreline, Washington 98133. The three parcels consist of (a) an approximately 24,000 square feet parcel on which a gas station is located and operated by the Debtors (the "Shoreline Station Parcel") (the gas station is referred to as the "Shoreline Station"), (b) approximately 15,000 square feet of undeveloped bare land created by way of a recent boundary line adjustment (the "BLA Parcel" or "BLA Property"), and (c) a small third parcel fronting 175th St. containing a small commercial space that the Debtors use as their business office (the "Shoreline Office Parcel").

1.35 "Lynnwood Station Property" means the real property owned by the Debtors located at 19930 44th Ave West, Lynnwood, Washington 98036, at which the Debtors operate a service station business and which consists of several dispenser

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 7

MPBA{00565297-1}

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 7 of 98

islands, a small mini mart, and a garage with mechanic's bays. The service station is referred to as the "Lynnwood Station."

1.36 "Richmond Beach Station Property" means the real property owned by the Debtors located at 656 NW Richmond Beach Rd., Shoreline, Washington 98177, at which the Debtors operate a service station business and which consists of several dispenser islands, a small mini mart, and a garage with mechanic's bays. The service station is referred to as the "Richmond Beach Station."

1.37 "Residence" or "Residence Property" means the personal residence owned and occupied by the Debtors located at 1027 NW 179th Place, Shoreline, Washington, 98177.

1.38 "Lake Stevens Residence" or "Lake Stevens Residence Property" means the personal residence titled in the names of the Debtors and their son, Kristopher Yourist, as tenants in common, located at 17255 Aurora Ave N, Shoreline, Washington, 98258.

# ARTICLE 2

## TREATMENT OF ADMINISTRATIVE CLAIMS & PRIORITY TAX CLAIMS

Each holder of an Allowed Administrative Claim (except any holder that agrees to different treatment) shall receive the Allowed Amount for its Administrative Claim, in cash, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, to be paid following Confirmation, on the Effective Date.

The Debtors shall pay their priority tax claims as follows: The Debtors shall make monthly installment payments to the Washington State Department of Revenue in the amount of $192, on or before the 15th day of each month, for a period of 52 months; to the Washington State Department of Labor and Industries in the amount

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 8

MPBA{00565297-1}

of $112 per month, on or before the 15th day of each month, for a period of 52 months; and to the Internal Revenue Service, in the amount of $450, on or before the 15th day of each month, for a period of 52 months; provided that the priority tax claims shall be paid in full from the proceeds of the sale of the first to close of the sale of the Shoreline Station Property / Shoreline Office Property or a sale of the Lynnwood Station Property, including statutory interest at the rate of one per cent per month as required by RCW 51.48.210 and Bankruptcy Code section 511.

## ARTICLE 3
## CLASSIFICATION OF CLAIMS AND INTERESTS

3.1. <u>Generally.</u> Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class.

3.2. <u>Unclassified Claims.</u> In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are excluded from the below-listed Classes. The treatment accorded Administrative Claims and Priority Tax Claims is set forth in Article 2 of the Plan.

3.3. Classes.

**Class 1** consists of the Debtors' secured claims, as follows:

**Class 1.A** – 5446 California Avenue Real Estate Partnership (Richmond Beach). The Class 1.A claim is the claim by 5446 California Avenue Real Estate Partnership in the original principal amount of $306,000 as evidenced by a promissory note dated March 20, 2012, and is secured by a first position Deed of

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 9

MPBA{00565297-1}

Trust against the Richmond Beach Property, recorded under King County recording No. 2012032001717 (the "5446 California Avenue Real Estate Partnership (Richmond Beach) Claim").

Class 1.B – 5446 California Avenue Real Estate Partnership (Lynnwood). The Class 1.B claim is the claim by 5446 California Avenue Real Estate Partnership in the original principal amount of $800,000 as evidenced by a promissory note dated October 6, 2009, and is secured by a first position Deed of Trust against the Lynnwood Station Property, recorded under Snohomish County recording No. 200910070327 (the "5446 California Avenue Real Estate Partnership (Lynnwood) Claim").

Class 1.C – Union Bank (Shoreline). The Class 1.C claim is the claim by Union Bank, N.A. in the original principal amount of $1,125,000 as evidenced by a promissory note dated March 14, 2003, and is secured by a first position Deed of Trust against the Shoreline Station Property, recorded under King County recording No. 20030317002642, and further is secured by the Debtors' Shoreline Station inventory, chattel paper, accounts, equipment and general intangibles (the "Union Bank (Shoreline) Claim").

Class 1.D – J.P. Morgan Chase (Residence – 1st DOT). The Class 1.D claim is the claim by J.P. Morgan Chase in the original principal amount of $543,750 as evidenced by a promissory note dated February 3, 3004, and is secured by a first position Deed of Trust against the Residence Property, recorded under King County recording No. 20040304000635 (the "J.P. Morgan Chase (Residence – 1st DOT) Claim").

Class 1.E – Vericrest Financial, Inc.(Residence – 2nd DOT). The Class 1.E claim is the claim by Vericrest Financial Inc. in the original principal amount of

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 10

MPBA{00565297-1}

$650,000 as evidenced by a promissory note dated October 14, 2005, and is secured by a second position Deed of Trust against the Residence Property, recorded under King County recording No. 20051026001661 (the "Vericrest Financial, Inc.(Residence – 2nd DOT) Claim").

**Class 1.F** – Raymond & Marilee Bowen (Residence – 3rd DOT). The Class 1.F claim is the claim by Raymond & Marilee Bowen in the original principal amount of $58,000 as evidenced by a promissory note dated March 10, 2009 and a third position Deed of Trust against the Residence Property, recorded under King County recording No. 20120730001846 (the "Bowen (Residence –3rd DOT) Claim").

**Class 1.G** – J.P Morgan Chase (Lake Stevens Residence – 1st DOT). The Class 1.G claim is the claim by J.P Morgan Chase in the original principal amount of $487,500 as evidenced by a promissory note dated November 6, 2003, and is secured by a first position Deed of Trust against the Lake Stevens Residence Property, recorded under Snohomish County recording No. 200311170963 (the "J.P Morgan Chase (Lake Stevens Residence – 1st DOT) Claim").

**Class 1.H** – J.P Morgan Chase (Lake Stevens Residence – 2nd DOT). The Class 1.H claim is the claim by .P Morgan Chase in the original principal amount of $840,000 as evidenced by a promissory note dated August 24, 2007, and is secured by a second position Deed of Trust against the Lake Stevens Residence Property, recorded under Snohomish County recording No. 200708291090 (the "J.P Morgan Chase (Lake Stevens Residence – 2nd DOT) Claim").

**Class 1.I** – Capital One Auto Finance (2008 Escalade). The Class 1.I claim is the claim by Capital One Auto Finance in the original principal amount of $35,000 as evidenced by a promissory note dated February 25, 2009, which claim is secured

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 11

MPBA{00565297-1}

by a security interest the Debtors' 2008 Cadillac Escalade ( the "Capital One Auto Finance (2008 Escalade) Claim").

**Class 1.J** – Allied Fuel, LLC (Lynnwood Station). The Class 1.J. claim is the claim by Allied Fuel, LLC ("Allied Fuel") arising out of upgrades to the EPOS equipment at the Lynnwood Station the Debtors' purchased in 2012 using Shell FDIP funds. Allied Fuel holds a purchase money security interest in those upgrades consisting of a cash register, operating computer, monitors and electronic components for five dispensers located the Lynnwood (the "Allied Fuel (Lynnwood Equipment) Claim").

**Class 1.K** – Allied Fuel, LLC (Shoreline Station Property). The Class 1.K claim is the contingent claim by Allied Fuel, LLC arising out of the Full Service Open Retailer Incentive Agreement dated January 13, 2003 originally between Equilon Enterprises LLC and the Debtors (the "Full Service Agreement") which agreement is secured by a second position deed of trust against the Shoreline Station Property recorded under King County recording No. 20031010003931 (the "Allied Fuel Deed of Trust") (the "Allied Fuel (Shoreline Station) Claim"). If the Debtors were to terminate the Full Service Agreement and cease purchasing fuel from Allied Fuel prior to the expiration date of the Full Service Agreement on January 13, 2018, the Debtors are obligated to Allied Fuel for liquidated damages per a formula in the Full Service Agreement, which obligation is secured by the Allied Fuel Deed of Trust.

**Class 1.L** – Wilson Oil, Inc. (Richmond Beach Station Fuel, Inventory and Equipment). The Class 1.L claim is the contingent claim by Wilson Oil, Inc. ("Wilson Oil") arising out of the Contract of Sale (Branded) Dealer Operating Agreement between the Debtors and Wilson Oil dated May 31, 2006, the Commodity Schedule (Motor Fuels) between the Debtors and Wilson Oil dated May 31, 2006; the

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 12

MPBA{00565297-1}

Amortization Agreement between the Debtors and Wilson Oil dated May 31, 2006; and the credit agreement between Debtors and Wilson Oil dated May 7, 2006 (collectively the "Wilson Oil Richmond Beach Contract"). The Wilson Oil Richmond Beach Contract is secured by a security interest in the Debtors' fuel inventory and snack, beverage, tobacco products and other like items in inventory at the mini-mart counter at the Richmond Beach Station (the "Wilson Oil, Inc. (Richmond Beach Station Fuel, inventory and equipment) Claim").

**Class 1.M** – Washington State Department of Revenue (Shoreline Station Property – Claim 1). The Class 1.M claim is the claim by Washington State Department of Revenue arising out of a tax warrant filed January 12, 2012 in the principal amount of $11,281.39 which constitutes a tax lien against the Shoreline Station Property (the "DOR Tax Lien 1").

**Class 1.N** – Washington State Department of Revenue (Shoreline Station Property – Claim 2). The Class 1.N claim is the claim by Washington State Department of Revenue arising out of a tax warrant filed January 12, 2012 in the principal amount of $6,462.28 which constitutes a tax lien against the Shoreline Station Property (the "DOR Tax Lien 2").

**Class I.O** – Department of Treasury / Internal Revenue Service (Lynnwood Station). The Class 1.O claim is the claim by Department of Treasury / Internal Revenue Service in the amount of $40,400.48 arising out of notices of tax liens filed May 1 and August 21, 2012 with the Snohomish County department of records and elections, which filings give rise to tax liens against the Lynnwood Station Property (the ".Department of Treasury / Internal Revenue Service (Lynnwood Station) Claim").

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 13

MPBA{00565297-1}

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 13 of 98

**Class 1.P** – Snohomish County Treasurer (Lynnwood Station). The Class 1.P claim is the claim by the Snohomish County Treasurer for real estate taxes assessed against the Lynnwood Station Property for the tax years 2010 ($16,545.21), 2011 ($15,098.31), 2012 ($12,545.54) and 2013 ($10,403.51) which amounts are secured by a statutory lien against the Lynnwood Station Property.

**Class 1.Q** – King County Treasurer (Shoreline Station Parcel). The Class 1.Q claim is the claim by the King County Treasurer for real estate taxes assessed against the Shoreline Station Parcel for the tax years 2011 (Land, $21,652.06, & Building, $7,176.15), 2012 (Land, $20,004.53, & Building, $7,285.29, and 2013 (Land, $15,973.92, and Building, $6,269.52) which amounts are secured by a statutory lien against the Shoreline Station Parcel (the "King County Treasurer (Shoreline Station Parcel) Claim").

**Class 1.R** – King County Treasurer (Office Parcel). The Class 1.R claim is the claim by the King County Treasurer for real estate taxes assessed against the Shoreline Office Parcel for the tax years 2011 ($6,741.22), 2012 ($6,447.65) and 2013 ($5,086.62) which amounts are secured by a statutory lien against the Shoreline Office Parcel (the "King County Treasurer (Office Parcel) Claim").

**Class 1.S** – King County Treasurer (Richmond Beach Station). The Class 1.S claim is the claim by the King County Treasurer for real estate taxes assessed against the Richmond Beach Station property for the tax year 2013 ($13,633.74) (the "King County Treasurer (Richmond Beach Station) Claim").

**Class 2** consists of all General Unsecured Claims except for those Unsecured Claims assigned to Class 3. Each holder of an Allowed General Unsecured Claim (except any holder that agrees to different treatment) shall receive payment, following Confirmation, as set forth in Article 4 below.

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 14

MPBA{00565297-1}

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 14 of 98

**Class 3** consists of Unsecured Claims of dollar amounts less than $1,100 (the Class of Convenience).

**Class 4** consists of the Unsecured Claim of Rod & Marilyn Madden in the amount of $130,571.33, which is evidenced by a promissory note with a maturity date of April 10, 2014.

**Class 5** consists of the Interests of the Individual Debtors in Property of the Estate.

# ARTICLE 4
# TREATMENT OF CLAIMS UNDER THE PLAN

Claims and Interests shall be treated in the manner set forth in this Article 4. Except as specifically provided elsewhere in the Plan, the treatment of, and the consideration to be received by, holders of Allowed claims and holders of Allowed Interests pursuant to the Plan shall be in full satisfaction, settlement, release and extinguishment of the respective Allowed Claims and Allowed Interests.

4.1. **Impaired Classes or Interests.** The classes of claims or interests consisting of Class 1.C, 1.F, 1.I, 1.K, 1.M, 1.N, 1.O, 1.P, 1.Q, 1.R, 1.S, 2 and 3 are impaired.

4.2. **Unclassified Claims and Demands: Administrative Expense Claims.** Allowed Administrative Expense Claims shall be paid on the Effective Date, or upon entry of a Final Order allowing such Claim, whichever shall occur later, unless the holders of such Claims agree to different treatment. Included in these payments will be payment, in full, on the Effective Date, of all quarterly fees due to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), as required by 11 U.S.C. § 1129(a)(12). In addition, the Debtors shall be responsible for timely payments of quarterly fees post-confirmation as required by 28 U.S.C. § 1930(a)(6). The Debtors

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 15

MPBA{00565297-1}

further shall file and serve on the United States Trustee a Disbursement Report for Confirmed Case on the fifteenth day of each month following the month in which the Plan is confirmed until a Final Decree has been entered.

### 4.3 Classified Claims.

4.3.1. **Class 1: Secured Claims.** The treatment to be provided to the holders of the Debtors' Class 1 Secured Claims is as follows:

**Class 1.A** – 5446 California Avenue Real Estate Partnership (Richmond Beach). The Class 1.A claim is the 5446 California Avenue Real Estate Partnership (Richmond Beach) Claim. The Promissory Note requires a monthly payment in the amount of $3,805, consisting of $2,805 in interest and $1,000 in principal. By its terms, the Promissory Note matured March 20, 2013. By agreement with the holder of this Class 1.A claim, the maturity date is being extended to December 31, 2014, in exchange for a 2% loan extension fee, which will be added to the principal balance of the promissory note, and payment of attorney's fees in the amount of $1,500 (which are payable within 30 days of the Effective Date. All other terms remaining the same. The Debtors shall execute an amendment to the Promissory Note modifying the maturity date and adding the extension fee, on or after the Effective Date of the Plan. Except as modified as to the maturity date and extension fee, the loan terms and security as set forth in the promissory note and deed of trust remain in full force and effect post-confirmation and are unmodified and unaltered by the Plan. The owner and holder of this Class 1.A claim shall retain, post-confirmation, all collateral held at the Petition Date, and post-confirmation the holder of the Class 1.A Claim shall have all remedies available under the security documents and applicable law if the Debtors default on the payment of the Class 1.A claim.

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 16

MPBA{00565297-1}

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 16 of 98

**Class 1.B** – 5446 California Avenue Real Estate Partnership (Lynnwood). The Class 1.B claim is the 5446 California Avenue Real Estate Partnership (Lynnwood) Claim. The Promissory Note requires a monthly payment in the amount of $7,34.34, consisting of interest only. By its terms, the Promissory Note matured October 6, 2010, although the Debtors have continued to make the installment payments on a monthly basis on and after the maturity date, and 5446 California Avenue Real Estate Partnership has accepted said payments. By agreement with the holder of this Class 1B. claim, the maturity date of the Promissory Note is extended to December 31, 2014, in exchange for a 2% loan extension fee, which will be added to the principal balance of the promissory note. All other terms remaining the same. The Debtors shall execute an amendment to the Promissory Note modifying the maturity date and adding the extension fee, on or after the Effective Date of the Plan. Except as modified as to the maturity date and extension fee, the loan terms and security as set forth in the promissory note and deed of trust remain in full force and effect post-confirmation and are unmodified and unaltered by the Plan. The owner and holder of this Class 1.B claim shall retain, post-confirmation, all collateral held at the time of the Petition Date, and post-confirmation the holder of the Class 1.B Claim shall have all remedies available under the security documents and applicable law if the Debtors default on the payment of the Class 1.F claim.

**Class 1.C** – Union Bank (Shoreline). The Class 1.C claim is the Union Bank (Shoreline) Claim. The Union Bank (Shoreline) Claim is secured by a first position Deed of Trust against the BLA Property, the Station Parcel and the Office Parcel, and further is secured by the Debtors' inventory, chattel paper, accounts, equipment and general intangibles located at said property. The Promissory Note calls for monthly installment payments in the amount of $8,583.45, and has a

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 17

MPBA{00565297-1}

maturity date of March 14, 2016. The Class 1.C Promissory Note is in default for the failure to make monthly payments from in the total approximate amount of $309,004.20 (as of the payment due on August 15, 2013) (36 payments at $8,583.45 per month from September 15, 2010 through August 15, 2013). The Debtors shall pay the Class 1.C claim as follows: The Debtors proposed treatment of the Class 1.C claim is as follows: Upon closing the sale of the BLA Property to Carter on the Effective Date (see Article 7.1, infra), (1) the Debtors will pay Union Bank the sum required to bring current the monthly payments presently in default on the Promissory Note, and any allowed costs, fees and expenses as may be agreed upon by the parties or fixed by Order of the Bankruptcy Court, thereby reinstating the Note under 11 U.S.C. §1123(a)(5(G) (by curing the payment defaults, no penalties or default interest are due and owing), (2) the Debtors will open a bank account and fund a reserve sufficient to make seven monthly payments to Union Bank on the Promissory Note ($60,084.15), and pending Carter's closing on its purchase of the Shoreline Station Parcel and the Shoreline Office Parcel, the Debtors shall make the monthly payments owing on the Promissory Note from funds in the reserve account, and (3) the Debtors shall remit the balance of proceeds as described in Article 7.1 of this Plan to Union Bank to be applied as a principal payment on the Promissory Note. If the Debtors have not closed the sale of the Station Parcel and the Office Parcel within seven months following the Effective Date, the Debtors shall continue to make the monthly payment to Union Bank out of cash flow from operations pending the closing of the sale of the Station Parcel and Office Parcel, and in the event that sale does not close, the Debtors shall list and market for sale the Station Parcel and Office Parcel. Union Bank shall retain its Deed of Trust lien against the Station

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

Parcel and the Office Parcel, and any other security held at the time of the Petition except its deed of trust interest in the BLA Property.

**Class 1.D** – J.P. Morgan Chase (Residence – 1st DOT). The Class 1.D claim is the P. Morgan Chase (Residence – 1st DOT) Claim. The loan terms and security as set forth in the promissory note and deed of trust shall remain in full force and effect post-confirmation, and are unmodified and unaltered by the Plan. Negotiations to modify this small loan balance are ongoing. The owner and holder of this Class 1.D claim shall retain, post-confirmation, its pre-petition deed of trust, and post-confirmation the holder of this Class 1.D Claim shall have all remedies available under the security documents and applicable law.

**Class 1.E** – Vericrest Financial, Inc.(Residence – 2nd DOT). The Class 1.E claim is the Vericrest Financial, Inc.(Residence – 2nd DOT) Claim. The Debtors and the holder of the Class 1.E claim have agreed to modify the payments terms to provide for a cure of existing defaults as follows: the (1) the Debtors shall resume making their regular monthly payment in the amount of $3,491.47 effective September 1, 2013, (2) the Debtors shall make an additional payment in the amount of $3,142.32 each month for six months beginning September 15, 2013 and ending February 15, 2014, and (3) beginning March 15, 2014, the Debtors shall make an additional monthly payment in the amount of $1,810.40 for fifty four months through September 15, 2018.. Except as so modified by agreement of the parties, the loan terms and security as set forth in the promissory note and deed of trust shall remain in full force and effect post-confirmation, and are unmodified and unaltered by the Plan. The owner and holder of this Class 1.E claim shall retain, post-confirmation, its pre-petition deed of trust, and post-confirmation the holder of this Class 1.E Claim shall have all remedies available under the security documents and applicable law.

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 19

MPBA{00565297-1}

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 19 of 98

**Class 1.F** – Raymond & Marilee Bowen (Residence – 3rd DOT). The Class 1.F claim is the Bowen (Residence –3rd DOT) Claim. Marilee Bowen is the sister of co-debtor Rosalie Yourist. The Deed of Trust securing payment of the Bowen Promissory was executed in March of 2009 but was not recorded until July 30, 2012 (within twelve months of the date of the filing of the Petition). The deed of trust securing this claim would be voidable as an insider preference but for the fact that the Debtors believe this to be a solvent estate. The Debtors shall pay this Class 1.F Claim in full, but shall do so on the same terms the holders of General Unsecured Claims are being paid under Class 3.

**Class 1.G** – J.P Morgan Chase (Lake Stevens Residence – 1st DOT). The Class 1.G claim is the J.P Morgan Chase (Lake Stevens Residence – 1st DOT) Claim. The loan terms and security as set forth in the promissory note and deed of trust shall remain in full force and effect post-confirmation, and are unmodified and unaltered by the Plan. The owner and holder of this Class 1.G claim shall retain, post-confirmation, its pre-petition deed of trust, and post-confirmation the holder of this Class 1.G Claim shall have all remedies available under the security documents and applicable law.

**Class 1.H** – J.P Morgan Chase (Lake Stevens Residence – 2nd DOT). The loan terms and security as set forth in the Promissory Note dated August 24,2007 and Deed of Trust, as amended by the Loan Modification Agreement dated April 11, 2013, shall remain in full force and effect post-confirmation and are unmodified and unaltered by the Plan. The owner and holder of this Class 1.G claim shall retain, post-confirmation, its pre-petition deed of trust, and the holder of this Class 1.G Claim shall have all remedies available under the loan documents and applicable law.

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 20

MPBA{00565297-1}

**Class 1.I** – Capital One Auto Finance (2008 Escalade). The Class 1.I claim is the Capital One Auto Finance (2008 Escalade) Claim. On the Effective Date of the Plan, the Debtors shall pay Capital One Auto Finance the monthly payment in the amount of $790 required under the auto financing agreement until the loan has been paid in full. The owner and holder of this Class 1.I claim shall retain, post-confirmation, its pre-petition security interest in the 2008 Escalade, and post-confirmation, the holder of this Class 1.I Claim shall have all remedies available under the security documents and applicable law post-confirmation.

**Class 1.J** – Allied Fuel, LLC (Lynnwood Station Equipment). The Class 1.J claim is the claim by Allied Fuel arising out of the purchase money loan it provided to the Debtors to upgrade the EPOS equipment located Lynnwood Station. The owner and holder of this Class 1.J.1 claim shall retain, post-confirmation, its pre-purchase money security interest in said equipment, and post-confirmation the holder of this Class 1.J Claim shall have all remedies available under the security documents and applicable law.

**Class 1.K** – Allied Fuel, LLC (Shoreline Station Property). The Class 1.K claim is the contingent claim by Allied Fuel arising out of the Full Service Open Retailer Incentive Agreement dated January 13, 2003 originally between Equilon Enterprises LLC and the Debtors, which agreement is secured second position deed of trust against the Shoreline Station Property. The Debtors sale to Carter of the BLA Property on the Effective date shall be free and clear of the Allied Fuel Deed of Trust and Allied Fuel shall be paid no proceeds from the sale of the BLA Property. The owner and holder of this Class 1.K claim shall retain, post-confirmation, its pre-petition deed of trust against the Shoreline Station Parcel and the Office Parcel. Upon the closing of a sale of the Shoreline Station Parcel and the Office Parcel,

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 21

MPBA{00565297-1}

proceeds from said sale shall be deposited into a separate bank account which shall serve as substitute security in an amount sufficient to fund the maximum amount of the liquidated damages that would be owing by the Debtors to Allied Fuel if the Full Service Agreement is terminated prior to the expiration date of the Full Service Agreement (less $30,000 which Allied Fuel presently has on deposit as additional security), with said liquidated damages amount to be agreed upon by the Debtors and Allied, and absent such an Agreement, as set by order of the Bankruptcy Court following notice and a hearing (the liquidated damages formula is three cents per gallon times the difference between the gallons purchased and the guaranteed minimum purchase amount of 1.5 million gallons; if the agreement were to be terminated by the Debtors and no gallons are purchased thereafter as a result, the annual liquidated damages payment would be $45,000. With 5 ½ years remaining, the maximum claim is $247,500). The amount of the reserve deposit shall be recalculated annually on March 1 (beginning March 1, 2014), and any funds in excess of the amount required to secure payment of the maximum liquidated damages amount shall be released to the Debtors.

Class 1.L – Wilson Oil, Inc. (Richmond Beach Station Fuel, Inventory and Equipment). The Class 1.L claim is the Wilson Oil, Inc. (Richmond Beach Station Fuel, Inventory and Equipment) Claim. The Class 1.L Claim is a contingent claim. The Debtors granted Wilson Oil a security interest in the fuel inventory located at the Richmond Beach Station as security for payment of fuel purchases. The payment arrangement between the Debtors and Wilson Oil for the Debtors' purchase of fuel from Wilson Oil is that the Debtors' bank account at Wells Fargo for the operations of the Richmond Beach Station is charged for fuel purchases upon delivery, with the result that the fuel supply account generally has a zero balance. This payment

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 22

MPBA{00565297-1}

arrangement shall continue post-confirmation, and Wilson Oil, Inc. shall retain, post-confirmation, its pre-petition security interests and all remedies available under the security documents and applicable law.

**Class 1.M** – Washington State Department of Revenue (Shoreline Station Property – Claim 1). The Class 1.M claim is the claim by Washington State Department of Revenue arising out of a tax warrant filed January 12, 2012, in the principal amount of $11,281.39, which constitutes a tax lien against the Shoreline Property (the "DOR Tax Lien 1"). The DOR Tax Lien 1 claim shall be paid in full, with interest, from proceeds received at closing from the sale of the Shoreline Station Parcel and the Shoreline Office Parcel.

**Class 1.N** – Washington State Department of Revenue (Shoreline Station Property – Claim 2). The Class 1.N claim is the claim by Washington State Department of Revenue arising out of a tax warrant filed January 12, 2012, in the principal amount of $6,462.28, which constitutes a tax lien against the Shoreline Station Property (the "DOR Tax Lien 2"). The DOR Tax Lien 2 claim shall be paid in full, with interest, from proceeds received at closing from the sale of the Shoreline Station Parcel and the Shoreline Office Parcel.

**Class 1.O** – Department of Treasury / Internal Revenue Service (Lynnwood Station). The Class 1.O claim is the .Department of Treasury / Internal Revenue Service (Lynnwood Station) Claim in the amount of $40,400.48 arising out of notices of tax liens filed May 1 and August 21, 2012 with the Snohomish County department of records and elections. This Class 1.O claim shall be paid in full, with interest, from proceeds received at closing from the sale of the Lynnwood Station Property.

**Class 1.P** – Snohomish County Treasurer (Lynnwood Station). The Class 1.P claim is the claim by the Snohomish County Treasurer for real estate taxes

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

Case 13-13512-KAO    Doc 80    Filed 09/04/13  Ent. 09/04/13 14:56:24    Pg. 23 of 98

assessed against the Lynnwood Station Property for the tax years 2010 ($16,545.21), 2011 ($15,098.31), 2012 ($12,545.54) and 2013 ($10,403.51). This Class 1.P claim shall be paid in full, with interest and penalties, from proceeds received at closing from the sale of the Lynnwood Station Property.

Class 1.Q – King County Treasurer (Shoreline Station Parcel). The Class 1.Q claim is the King County Treasurer (Shoreline Station Parcel) Claim for the tax years 2011 (Land, $21,652.06, & Building, $7,176.15), 2012 (Land, $20,004.53, & Building, $7,285.29, and 2013 (Land, $15,973.92, and Building, $6,269.52). This Class 1.Q claim shall be paid in full, with interest, from proceeds received at closing from the sale of the Shoreline Station Parcel.

Class 1.R – King County Treasurer (Shoreline Office Parcel). The Class 1.R claim is the King County Treasurer (Office Parcel) Claim for real estate taxes owing for the tax years 2011 ($6,741.22), 2012 ($6,447.65) and 2013 ($5,086.62). This Class 1.R claim shall be paid in full, with interest, from proceeds received at closing from the sale of the Shoreline Office Parcel.

Class 1.S – King County Treasurer (Richmond Beach Station). The Class 1.S claim is the claim by the King County Treasurer for real estate taxes assessed against the Richmond Beach Station property for the tax year 2013 ($13,633.74) (the "King County Treasurer (Richmond Beach Station) Claim"). The Debtors shall pay this Class 1S. claim on or before October 31, 2013 out of revenue generated from the operation of the Richmond Beach Station.

4.3.2. **Class 2: General Unsecured Claims.** The holders of Allowed Class 2 General Unsecured Claims shall be paid as follows: The Debtor will pay the holders of Allowed General Unsecured Claims, on a pro rata basis, as distributions are made under the Plan, until they have been paid in full. The source of the funds to

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 24

MPBA{00565297-1}

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 24 of 98

pay the Class 2 claimants is the net proceeds from the sale of the Shoreline Station Parcel and the Shoreline Office Parcel, and the Lynnwood Station Property. If the Class 2 claims have not been paid in full within eighteen months of the date of confirmation of the Plan, the holders of Class 2 claims shall have all rights and remedies available under state law to pursue collection of their claims.

Any Class 2 Claims with respect to which an objection is pending as of said payment date will be reserved from payment until a Final Order is entered disposing of and/or resolving the Claim.

4.3.3.     **Class 3: General Unsecured Claims (Class of Convenience).** When funds become available under Article 7 of the Plan for distribution to holders of Allowed General Unsecured Claims, the holders of the Class 3 claims shall be paid in full out of the first dollars available for distribution to General Unsecured Creditors.

4.3.4     **Class 4: General Unsecured Claim of Rod & Marilyn Madden.** The Debtors will pay the Class 4 claim on or before maturity out of the proceeds of the sale of the latest to sell of the Shoreline Station Parcel/Shoreline Office Parcel or the Lynnwood Station Property.

4.3.5.     **Class 5: The Interests of the Individual Debtors in Property of the Estate.** Property of the Estate shall vest in the Debtors on the Effective Date, subject to the security held by Class 1 claimants and subject to the Debtors obligation to perform their duties and make the payments provided for in this Plan. The Debtors shall retain the property claim as exempt in their Schedule C on file in this proceeding.

# ARTICLE 5

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 25

MPBA{00565297-1}

# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1 <u>Assumption Of Unexpired Leases/Executory Contracts</u>. The Debtors were not a party to any leases and are not assuming any leases under the Plan. The Debtors are a party to three executory contracts, which are being assumed under the Plan.

The first executory contract being assumed by the Debtors is the Full Service Open Retailer Incentive Agreement dated January 13, 2003 originally between Equilon Enterprises LLC and the Debtors. The Debtors are assuming this contract as Allied Fuel is the fuel supplier to the Shoreline Station and the Debtors need an ongoing supply of fuel to operate this station.

The second executory contract being assumed by the Debtors is the Retailer Product Sales Agreement for Shell Brand with Allied Fuel dated June 1, 2011. The Debtors are assuming this contract as Allied Fuel is the fuel supplier to the Lynnwood Station and the Debtors need an ongoing supply of fuel to operate this station.

The third executory contract being assumed by the Debtors is the Wilson Oil Richmond Beach Contract, consisting of the (1) the Contract of Sale (Branded) Dealer Operating Agreement between the Debtors and Wilson Oil dated May 31, 2006, and addendum between the parties dated April 15, 2010; (2) the Commodity Schedule (Motor Fuels) between the Debtors and Wilson Oil dated May 31, 2006; (3) the Amortization Agreement between the Debtors and Wilson Oil dated May 31, 2006; and (4) the credit agreement between Debtors and Wilson Oil dated May 7, 2006. The Debtors are assuming the Wilson Oil Richmond Beach Contract as Wilson Oil is the fuel supplier to the Richmond Beach Station and the Debtors need an ongoing supply of fuel to operate this station.

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 26

MPBA{00565297-1}

5.2 <u>Rejected Unexpired Leases And Executory Contracts</u>. The Debtor hereby expressly rejects, pursuant to Section 365 of the Bankruptcy Code, any executory contract or unexpired lease not expressly assumed in this Plan.

5.3 <u>Damages Upon Rejection</u>. The Bankruptcy Court shall determine the dollar amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any executory contract or unexpired lease. Unless otherwise ordered by the Bankruptcy Court, the Confirmation Order shall operate to set a bar date for claims for damages arising out of the rejection of any executory contract or unexpired lease, which bar date shall be the first Business Day that is thirty days after the Confirmation Date. The notice of Confirmation to be delivered pursuant Bankruptcy Rules 2002 and 3020(c) will set forth such date and constitute notice thereof. To the extent any such Claim is Allowed by the Bankruptcy Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as a Class 2 Claim.

# ARTICLE 6
# ACCEPTANCE OR REJECTION OF THE PLAN

6.1 <u>Each Impaired Class Entitled to Vote Separately</u>. The holders of Claims or Interests in each impaired Class of Claims or Interests, shall be entitled to vote separately to accept or reject the Plan.

6.2 <u>Acceptance By Impaired Classes of Claims</u>. Pursuant to Section 1126(c) of the Bankruptcy Code, an impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class (other than Claims held by any holder designated pursuant to Section 1126(e) of the Bankruptcy Code) have voted to accept the Plan and (b) more than one-half in number of such Allowed Claims actually voting in such Class (other

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 27

MPBA{00565297-1}

than Claims held by any holder designated pursuant to Section 1126(e) of the Bankruptcy Code) have voted to accept the Plan.

# ARTICLE 7
# IMPLEMENTATION OF THE PLAN

7.1   <u>Sale of Shoreline Station Property; Leaseback of Station Parcel</u>.   On July 11, 2013, the Debtors and Carter & Carter LLC executed a Master Agreement (1) for the purchase and sale of the BLA Property for the previously agreed price of $787,176, to be closed within fourteen days of confirmation of a plan of reorganization authorizing a sale of the BLA Property to Carter free and clear of liens (the "BLA Property Sale"), and also (2) for the purchase and sale of the combined Station Parcel and Office Parcel for a purchase price of $1,621,048.00, subject to a feasibility contingency, payable in cash, at closing, with closing is to occur within thirty days of satisfying the feasibility contingency, which has an outside date of 180 days from Bankruptcy Court approval of the sale, free and clear of liens through confirmation of the Plan, and with a five year lease back to the Debtors of the Station Parcel and an option to extend that lease for an additional five years, at a rental rate of $1,000 per month, triple net.   A copy of the Master Agreement is attached hereto as Exhibit A.   The Debtors are selling the BLA Property and the combined Shoreline Station Parcel/Shoreline Office Parcel under this Plan.

Fourteen days following confirmation of the Plan, the Debtors will proceed to close the sale of the BLA Property to Carter through the Plan as authorized by 11 U.S.C. §1123(a)(5)(D), free and clear of the Union Bank Deed of Trust as to the BLA Property.   Because the BLA Property is being sold under the terms of a confirmed Plan, the sale is exempt from the Washington Real Estate Excise Tax under WAC

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 28

MPBA{00565297-1}

Case 13-13512-KAO   Doc 80   Filed 09/04/13   Ent. 09/04/13 14:56:24   Pg. 28 of 98

458-61A-207(1). The net proceeds of sale after payment of seller's closing costs and after making a tax deposit to the Internal Revenue Service to pay the anticipated capital gains tax arising from the sale will be disbursed, first to bring current the monthly payments in default on the Union Bank Promissory Note, and any allowed costs, fees and expenses, thereby reinstating the Note under 11 U.S.C. §1123(a)(5(G), second to establish a reserve account for the payment of seven months of monthly payments to Union Bank under the Promissory Note, third, a hold back of $50,000 to pay costs of administration, and fourth, the balance of net proceeds shall be paid to Union Bank to be applied as a principal payment on the Promissory Note. Union Bank shall retain, at the closing of the BLA Property, its deed of trust interest against the Shoreline Station Parcel and the Shoreline Office Parcel.

With respect to the sale of the Shoreline Station Parcel and the Shoreline Office Parcel, upon satisfaction of the feasibility contingency, the Debtors will proceed to close the sale of those two parcels to Carter through the Plan as authorized by 11 U.S.C. §1123(a)(5)(D), free and clear of all liens and encumbrances. Because the BLA Property is being sold under the terms of a confirmed Plan, the sale is exempt from the Washington Real Estate Excise Tax under WAC 458-61A-207(1). The proceeds of the sale will be disbursed, first in payment of seller's closing costs, second, for a tax deposit to the Internal Revenue Service to pay the anticipated capital gains tax arising from the sale, third, in full satisfaction of the balance of any principal and interest owing to Union Bank on its Class 1.C claim, fourth, in payment of the DOR Tax Lien 1 and DOR Tax Lien 2 (the Class 1.M and 1.N claims), fifth, in payment of the real property taxes owing on the two parcels (the Class 1.Q and 1.R claims), sixth, to fund the reserve account for the contingent claim of Allied Fuel, as

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 29

MPBA{00565297-1}

provided in Article 4.3.1, Class 1.K, and seventh to the holders of Allowed Class 3 and Class 2 claims. The Debtors and Carter further shall execute, at the closing of the sale of the Shoreline Station Parcel and the Shoreline Office Parcel, lease of the Shoreline Station Parcel to the Debtors for a five year term, with base rent of $1,000 per month and triple net charges, and with an option to extend the term for an additional five years.

7.2. <u>Listing and Sale of Lynnwood Station Property</u>. The Debtors will list the Lynnwood Station Property for sale under the terms of an Exclusive Sale Listing Agreement with Western Realty Advisors Inc. ("Western"), a copy of which is attached hereto as Exhibit B, for a list price of $1,600,000 and a commission of five percent. If the Court has not previously entered such an order so authorizing the Debtors, the Debtors shall be and are authorized by the Plan to enter into the Exclusive Sale Listing Agreement with Western Realty Advisors Inc. with Western and to sell the Lynnwood Station Property under the authority of 11 U.S.C. §1123(a)(5)(D), free and clear of liens, with all liens attaching to the proceeds, and with the net proceeds distributed as provided elsewhere in the Plan. Because the Lynnwood Station Property is being sold under the terms of a confirmed Plan, the sale is exempt from the Washington Real Estate Excise Tax under WAC 458-61A-207(1). The sale of the Lynnwood Station Property shall be subject to notice to creditors and entry of an order by the Bankruptcy Court approving the sale price.

Any priority tax claim(s), and any claims in Class 2 or Class 3 not paid at the time of the closing of a sale of the Shoreline Station Property and the Shoreline Office Property (if that sale closes before the Lynnwood Station Property is sold), will be paid out of the net proceeds of the sale of the Lynnwood Station Property after (1) paying closing costs, (2) making a tax deposit to the Internal Revenue Service to pay

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 30

MPBA{00565297-1}

the anticipated capital gains tax arising from the sale, (3) paying the secured obligation to 5446 California Avenue Real Estate Partnership on its Class 1.B claim, (4) paying real estate taxes (the Class 1.P claim), (5) paying the Internal Revenue Service tax lien (the Class 1O claim), and (6) paying any claim owing to Wilson Oil arising out of the closing of the Lynnwood service station business (as discussed below).

7.3   <u>Wilson Oil Claims Settlement</u>.   Wilson Oil filed a proof of claim and amendment thereto [Claim No. 11] in the Debtors' bankruptcy case, Case No. 13-13512-KAO, consisting of:   (1) a general unsecured claim in the amount of $261,488.70 regarding the Debtors' contractual obligations to Wilson Oil as to the Debtors' Westgate gas station, and (2) a general unsecured claim in the amount of $96,473.96 regarding Debtors' contractual obligations to Wilson Oil as to Debtors' Richmond Beach Station.   The unsecured claim of Wilson Oil in the amount of $261,488.70 was the subject of a dispute and lawsuit pending in King County Superior Court at the date of the Petition (Wilson Oil filed a lawsuit in King County Superior Court, Case No. 13-2-03650-9 SEA, against Debtors and Yourist Enterprizes, Inc. (a now defunct/inactive Washington corporation) ("the Lawsuit"). The Debtors have agreed to withdraw their objection and settle the dispute by allowing that claim as filed.   That settlement, as set forth in the Settlement Agreement between the Parties, a copy of which is attached hereto as Exhibit C,hereby is incorporated into the Plan, and upon confirmation of the Plan, the Settlement Agreement will be deemed approved, the Lawsuit will be dismissed as against the Debtors without prejudice, and the Wilson Oil claim in the amount of $261,488.70 will be deemed allowed.   The second general unsecured claim filed by Wilson Oil in the amount of $96,473.96 regarding Debtors' contractual obligations to Wilson Oil as to

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 31

MPBA{00565297-1}

Case 13-13512-KAO   Doc 80   Filed 09/04/13   Ent. 09/04/13 14:56:24   Pg. 31 of 98

Debtors' Richmond Beach gas station is being withdrawn in exchange for the Debtors assumption of all obligations to Wilson Oil under the applicable fuel supply contract documents between the Debtors and Wilson Oil as more fully described in Article 5.1 above.

7.4. <u>Post Confirmation Operations of Business of the Debtor.</u> The Debtors will continue to operate the gasoline/service station businesses at the Shoreline Station Property, the Lynnwood Station Property, and the Richmond Beach Station Property; provided that upon closing on the sale of the Lynnwood Station Property, the Debtors will close the gasoline/service station business being operated at the Lynnwood Station Property. Cash from the operation of these gasoline/service station business shall be used to pay the ordinary operating expenses of those businesses, all related payroll and taxes, and payments on the promissory notes owing to the holder of the Class 1.A and Class 2.A claims, and if the sale of the sale of the Shoreline Station Parcel and the Shoreline Office Parcel has not closed within seven months, the Debtors further shall make the monthly payment on the Promissory Note held by the holder of the Class 1.C claim, real property taxes for those properties, and the Debtors' compensation as provided for in section 7.4 below.

7.5. <u>Management of Reorganized Debtor.</u> On and after the Confirmation Date, the business and affairs of the Reorganized Debtors will be managed by the Debtors. The Debtors will perform the necessary services to manage their gasoline/service station business and to oversee the disbursements provided for in the Plan. The Debtors will be compensated at a fixed monthly salary in the amount of $8,000 per month.

7.6. <u>Unclaimed Property.</u> Any Cash, assets, and other property to be distributed under the Plan that remain unclaimed (including by an Entity's failure to

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 32

MPBA{00565297-1}

negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one year after distribution or (b) 120 calendar days after an order allowing such Entity's Claim becomes a Final Order, shall result in cancellation of such Entity's claim to the extent of the unclaimed amount. In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall deemed to have waived its rights to such payments or distributions under the Plan pursuant to Section 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

7.7. <u>Plan Distributions</u>. The Debtors shall make all distributions required under the Plan.

7.8 <u>Reservation and Prosecution of Claims</u>. All rights, claims and causes of action, whether equitable or legal, of the Debtors or the Reorganized Debtors against all persons and entities, including without limitation all claims and causes of action for the avoidance and recovery of preferential and fraudulent transfers under §§ 544-550 of the Bankruptcy Code, are reserved for the Reorganized Debtor. During the pendency of the Reorganization Case, prior to or following Confirmation, the Debtors or Reorganized Debtors shall investigate, prosecute and/or settle all claims held by the Debtors, as the Reorganized Debtors in their judgment deem appropriate, and may commence adversary proceedings against persons or entities to realize upon causes of action retained. The proceeds from any recoveries on claims under this paragraph shall be deemed unencumbered funds and shall be distributed in accordance with the provisions of Article 4 of this Plan.

7.9. <u>Further Authorization</u>. The Plan Proponents and Reorganized Debtors, if and to the extent necessary, shall seek such orders, judgments, injunctions and

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 33

MPBA{00565297-1}

Case 13-13512-KAO   Doc 80   Filed 09/04/13   Ent. 09/04/13 14:56:24   Pg. 33 of 98

rulings that any of them deem necessary to carry out further the intentions and purposes of, and give full effect to the provisions of, the Plan.

7.10. <u>Effectuating Documents and Further Transactions</u>. The Yourists shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

# ARTICLE 8
# INJUNCTIONS

Except as specifically provided in the Plan or in the Confirmation Order, effective on the Confirmation Date, Confirmation shall operate as an injunction prohibiting and enjoining the commencement or continuation of any action, the employment of process or any act to collect, recover from or offset any Claim or Demand against the Debtors by any person.

# ARTICLE 9
# MATTERS INCIDENT TO PLAN CONFIRMATION

9.1. <u>Term of Certain Injunctions And Automatic Stay</u>. All of the injunctions and/or automatic stays provided for in or in connection with the Reorganization Case, whether pursuant to Section 105, Section 362 or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to Confirmation shall remain in full force and effect until the injunction provided for in Article 8 above becomes effective, and thereafter if so provided by the Plan, the Confirmation Order or by their own terms. In addition, on and after Confirmation, the

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 34

MPBA{00565297-1}

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 34 of 98

Plan Proponent may seek such further orders as it may deem necessary to preserve the status quo during the time between Confirmation and the Confirmation Date.

9.2. <u>Institution And Maintenance Of Legal And Other Proceedings</u>. As of the Confirmation Date, the Reorganized Debtors shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any asset, liability or responsibility under the Plan, and shall be empowered to initiate, prosecute, defend and resolve all such actions it deems necessary or appropriate.

9.3. <u>Vesting</u>. Except as otherwise expressly provided in the Plan, on the Confirmation Date, the Reorganized Debtors shall be vested with all of the assets and property of the former Estate, free and clear of Claims, Liens, charges and other interests of holders of Claims or interests.

# ARTICLE 10
## RESOLUTION OF DISPUTED CLAIMS

As soon as practicable, but in no event later than six months after the entry of the Confirmation Order, unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed with the Bankruptcy Court, provided that the Reorganized Debtors may seek to extend such period (or any extended period) for cause.

# ARTICLE 11
## NO DISCHARGE OF DEBTOR

The Debtors do not seek, and are not receiving, a discharge under the Plan because this is a solvent estate and all creditors will be paid or otherwise receive the relief to which they are entitled under state law under the provisions of the Plan.

# ARTICLE 12

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 35

MPBA{00565297-1}

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

# MISCELLANEOUS

12.1. <u>Jurisdiction</u>.   Until the Reorganization Case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out. Except as otherwise provided in the Plan, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtor, and to adjudicate and enforce all other causes of action which may exist on behalf of the Debtor.

12.2. <u>General Retention</u>.   Following the Confirmation of the Plan, the Bankruptcy Court shall retain jurisdiction for the purpose of classification of any Claim and the re-examination of Claims which have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claim.   The failure by the Plan Proponent to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the right of the Debtor to object to or re-examine such Claim in whole or part.

12.3. <u>Specific Purposes</u>.  In addition to and without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following specific purposes after Confirmation of the Plan:

(a)   to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)   to hear and enter an order on a motion by the Debtors brought pursuant to Article 7.2 of the Plan with respect to the sale of the Lynnwood Station Property;

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

(c)    correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan so that the intended effect of the Plan may be substantially realized thereby;

(d)    to assure the performance by the Debtor of its obligations to make distributions under the Plan;

(e)    to enforce and interpret the terms and conditions of the Plan;

(f) to hear and determine all applications for compensation of professionals and reimbursement of expenses under Sections 330, 331 or 503(b) of the Bankruptcy Code;

(g) to hear or determine any action brought by the Debtor or Reorganized Debtor seeking to avoid any transfer of an interest of the Debtor in property, or any obligation incurred by Debtor, that is avoidable pursuant to applicable law, including without limitation actions pursuant to §§ 544, 545, and 547-550 of the Bankruptcy Code.

(h)    to hear and determine any causes of action arising during the period from the Petition Date through the Confirmation Date, or in any way related to the Plan;

(i) to determine such other matters and for such other purposes may be provided in the Confirmation Order; and

(j)    to consider and act on the compromise and settlement of any Claim against or Interest in the Debtor or its Estate.

12.4. <u>Modification of Plan</u>.  The Plan Proponent may propose amendments to or modifications of the Plan under Section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date.  After Confirmation, the Plan Proponent may remedy any defects or omissions or reconcile any inconsistencies in the Plan, or the

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 37

MPBA{00565297-1}

Confirmation Order or any other order entered for the purpose of implementing Plan in such manner as may be necessary to carry out the purposes and intent of the Plan so long as the interests of the holders of Allowed Claims are not adversely affected.

12.5. <u>Modification of Payment Terms</u>. The Plan Proponent reserves the right to modify the treatment of any Allowed Claim, as provided in Section 1123(a)(4) of the Bankruptcy Code, at any time after the Confirmation Date upon the consent of the holder of such Allowed Claim.

12.6. <u>Entire Agreement</u>. The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersedes all prior discussions and documents. No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

12.7. <u>Headings</u>. Headings are utilized in the Plan for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

12.8. <u>Governing Law</u>. Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or where the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, construed, and enforced in accordance with, the laws of the State of Washington, without giving effect to the principles of conflicts of law thereof.

12.9. <u>Estimated Claims</u>. To the extent any Claim is estimated for any purpose other than for voting, then in no event shall such Claim be Allowed in an amount greater than the estimated amount.

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

12.10. <u>Unmarked Ballots</u>. Executed ballots, if any, respecting the Plan returned by creditors or parties in interest to Debtor which do not indicate acceptance or rejection of the Plan shall be deemed and counted as acceptances of the Plan.

12.11. <u>Unnegotiated Distribution Checks</u>. Pursuant to Section 347(b) of the Bankruptcy Code, one hundred and eighty (180) days after any distribution to any unsecured creditor by Debtors, or if applicable, by the Reorganized Debtors provided for herein, the Reorganized Debtors shall stop payment on any check on such distribution remaining unpaid to a holder of an Allowed Claim and funds shall be returned to the Debtors. From and after the date the Debtors stops payment on any distribution check pursuant to this paragraph, the holder of the claim on account of which such check was issued shall be entitled to receive no further distributions on account of its claim and such holder's Allowed Claim shall thereupon be deemed satisfied in full.

12.12. <u>Administrative Claims Bar Date</u>. The deadline for submission of all claims entitled to priority pursuant to Sections 507(a)(1) and (b) of the Bankruptcy Code incurred before entry of the Confirmation Order, with the exception of fees and costs of Professional Persons, shall be thirty (30) days following entry of the Confirmation Order. Failure to file a claim and schedule a hearing by this date shall conclusively bar the claimant from asserting its claim, which claim shall be forever discharged.

# ARTICLE 13

# CLAIMS OBJECTIONS AND TREATMENT OF DISPUTED CLAIMS

13.1. <u>Defenses and Counterclaims</u>. The Debtors shall acquire all defenses, counterclaims and setoffs, whether equitable or legal, of the Debtors and Debtors-in-

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 39

MPBA{00565297-1}

possession to claims held or asserted to be held against the Debtors, except as provided by this Plan.

13.2. <u>No Distribution on Disputed Claims</u>. Notwithstanding any provision of the Plan specifying the time for payment of distributions to holders of claims, no payment or distribution shall be made to the holder of any Disputed Claim until the time such claim has been determined to be an Allowed Claim. At the time of each payment or distribution to holders of claims in a class or unclassified category which contains any Disputed Claim, the Debtors shall reserve in a separate fund the amount which would have been distributed to holders of the Disputed Claims had their claims been Allowed Claims so that the timing of distributions to other creditors shall not be affected by any delay in the resolution of Disputed Claims. Upon the allowance of any Disputed Claim, the holder shall be paid from the separate fund the amount which such holder would have received had its claim been an Allowed Claim on the Confirmation Date.

RESPECTFULLY SUBMITTED this 3rd day of September, 2013.

/s/ Harry R. Yourist
Harry R. Yourist


/s/ Rosalie H. Yourist
Rosalie H. Yourist

DATED this 3rd day of September, 2013.

MONTGOMERY PURDUE BLANKINSHIP
& AUSTIN, PLLC


By: /s/ Michael E. Gossler
Michael E. Gossler
WA State Bar No. 11044
Attorneys for Debtors

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

DEBTORS' FIRST AMENDED
PLAN OF REORGANIZATION - 40

MPBA{00565297-1}

Case 13-13512-KAO    Doc 80    Filed 09/04/13    Ent. 09/04/13 14:56:24    Pg. 40 of 98

# EXHIBIT A

## MASTER AGREEMENT

### (Carter / Yourist)

This Agreement is entered into July 11, 2013 by and between Carter and Carter LLC, a Washington limited liability company ("Buyer"), and Harry and Rosalie Yourist, husband and wife ("Seller"), concerning the real property commonly known as 17255 Aurora Avenue North, Shoreline, Washington ("Yourist Property").

Recitals

A. Buyer and Seller into that certain Commercial & Investment Purchase and Sale Agreement April 1 2011, as amended ("2011 PSA") for Seller to sell to Buyer, a portion of the Yourist Property described therein ("BLA Property") upon completion of a boundary line adjustment. A copy of the 2011 PSA is attached as Exhibit A and incorporated herein by reference. The boundary line adjustment contemplated by the 2011 PSA was recorded and Buyer was prepared to close its purchase of the BLA Property March of 2013, all contingencies had been satisfied, financing was approved, and clear title was obtained except for the removal of the Deed of Trust by Union Bank. Union Bank declined to partially reconvey its deed of trust from the BLA Property, so that the transaction failed to close. Buyer remains willing to purchase the BLA Property on the previously agreed terms.

B. Buyer is also interested in purchasing the balance of the Yourist Property on the terms of the Commercial & Investment Real Estate Purchase and Sale Agreement attached hereto and incorporated herein by reference as Exhibit B ("2013 PSA").

C. Seller has filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the Western District of Washington at Seattle under Bankruptcy Case No. 13-13512-KAO (the "Yourist Bankruptcy Proceeding"). Seller is operating in the Yourist Bankruptcy Proceeding as a debtor-in-possession.

D. This Agreement is entered into two coordinate and ratify the 2011 PSA and the 2013 PSA and explain the interrelationship between the two.

Agreement

For consideration the sufficiency of which is the knowledge by the parties it is agreed as follows

1. The 2011 PSA is hereby ratified by the parties; the 2011 PSA is amended to reflect that the closing date on the BLA Property shall be two weeks after the satisfaction of the following contingencies:
   a. Confirmation of a plan of reorganization in the Yourist Bankruptcy Proceeding which approves the 2011 PSA and approves the sale of the BLA Property free and clear of liens, or upon entry of an order approving 2011 PSA and authorizing the sale of the

{00524439-5}

BLA Property free and clear of liens under Section 363(b)(1) & (f) of the Bankruptcy Code prior to confirmation of a plan of reorganization.

b. Title to the BLA Property shall be subject to no exceptions other than those approved in Exhibit C attached hereto and incorporated herein by reference.

c. There shall be no material adverse change in the condition of the BLA Property.

2. Provided that Buyer purchases the BLA Property, as described in 1), above, the 2013 PSA shall be in full force and effect according to its terms and subject to the contingencies set forth therein. If Buyer does not close on its purchase of the BLA Property as provided in paragraph (1), above, then the 2013 PSA shall terminate and be of no further force or effect.

Dated July 11, 2013.

SELLER:

_____
Harry Yourist

_____
Rosalie Yourist

BUYER:

Carter and Carter, LLC

By: _____

Its: _____

{00524439-5}

**Exhibit A**

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED



CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 1 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
### PURCHASE & SALE AGREEMENT

*This has been prepared for submission to your attorney for review and approval prior to signing. No representation is made by licensee as to its sufficiency or tax consequences*

Reference Date: _____ *April 1, 2001* _____

*Carter Family and Carter, LLC.* ("Buyer") agrees to buy and *Harry and Rosalie Yourist* ("Seller") agrees to sell, on the following terms, the commercial real estate and all improvements thereon (collectively, the "Property") commonly known as _935 North 175th, Shoreline WA, 98133_ in the City of _____ *Shoreline* _____, _____ *King* _____ County, Washington, legally described on attached Exhibit A. The Reference Date above is intended to be used to reference this Agreement, and is not the date of "Mutual Acceptance." Mutual Acceptance is defined in Section 23 below.

1. **PURCHASE PRICE.** The total purchase price is *Seven hundred eighty seven thousand and one hundred seventy six* _____ Dollars ($ _787,176.00_ ) payable as follows (check only one):

   ☒ All cash at closing with no financing contingency.

   ☐ All cash at closing contingent on new financing in accordance with the Financing Addendum (attach CBA Form PS_FIN).

   ☐ $_____ OR _____% of the purchase price in cash at closing with the balance of the purchase price paid as follows (check one or both, as applicable): ☐ Buyer's assumption of the outstanding principal balance as of the Closing Date of a first lien note and deed of trust (or mortgage), or real estate contract, in accordance with the Financing Addendum (attach CBA Form PS_FIN); ☐ Buyer's delivery at closing of a promissory note for the balance of the purchase price, secured by a deed of trust encumbering the Property, in accordance with the Financing Addendum (attach CBA Form PS_FIN).

   ☐ Other: _____

2. **EARNEST MONEY.** The earnest money in the amount of $ _____ *NA* _____ shall be in the form of ☐ Cash ☐ Personal check ☐ Promissory note (attached CBA Form EMN) ☐ Other: _____

   The earnest money shall be held by ☐ Selling Firm ☐ Closing Agent. Selling Broker may, however, transfer the earnest money to Closing Agent.

   Buyer shall deliver the earnest money no later than:
   ☐ _____ days after Mutual Acceptance.
   ☐ On the last day of the Feasibility Period defined in Section 5 below.
   ☐ Other: _____

   If the earnest money is to be held by Selling Firm and is over $10,000, it shall be deposited to: ☐ Selling Firm's pooled trust account (with interest paid to the State Treasurer) ☐ A separate interest bearing trust account in Selling Firm's name. The interest, if any, shall be credited at closing to Buyer. If this sale fails to close, whoever is entitled to the earnest money is entitled to interest.

   Selling Firm shall deposit any check to be held by Selling Firm within 3 days after receipt or Mutual Acceptance, whichever occurs later. Buyer agrees to pay financing and purchase costs incurred by Buyer. Unless otherwise provided in this Agreement, the earnest money shall be applicable to the purchase price.

3. **EXHIBITS AND ADDENDA.** The following Exhibits and Addenda are made a part of this Agreement:
   ☒ Exhibit A - Legal Description
   ☐ Earnest Money Promissory Note, CBA Form EMN

INITIALS: BUYER _____ DATE _4-29-11_ SELLER _____ DATE _4-28-011_
BUYER _____ DATE _____ SELLER _____ DATE _4-28-11_

Form generated by: TrueForms™   www.TrueForms.com   800-499-9612

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED

CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 2 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

- ☐ Promissory Note, LPB Form No. 28A/
- ☐ Short Form Deed of Trust, LPB Form No. 20
- ☐ Deed of Trust Rider, CBA Form DTR
- ☐ Utility Charges Addendum, CBA Form UA
- ☒ FIRPTA Certification, CBA Form 22E
- ☐ Assignment and Assumption, CBA Form PS-AS
- ☒ Addendum/Amendment, CBA Form PSA
- ☐ Back-Up Addendum, CBA Form BUA
- ☒ Vacant Land Addendum, CBA Form VLA
- ☒ Financing Addendum, CBA Form PS_FIN
- ☐ Tenant Estoppel Certificate, CBA Form PS_TEC
- ☐ Defeasance Addendum, CBA Form PS_D
- ☐ Other _____

4. **SELLER'S UNDERLYING FINANCING.** Unless Buyer is assuming Seller's underlying financing, Seller shall be responsible for confirming the existing underlying financing is not subject to any "lock out" or similar covenant which would prevent the lender's lien from being released at closing. In addition, Seller shall provide Buyer notice prior to the end of the Feasibility Period if Seller is required to substitute securities for the Property as collateral for the underlying financing (known as "defeasance"). If Seller provides this notice of defeasance to Buyer, then the parties shall close the transaction in accordance with the process described in CBA Form PS_D or any different process identified in Seller's defeasance notice to Buyer.

5. **FEASIBILITY CONTINGENCY.** Buyer's obligations under this Agreement are conditioned upon Buyer's satisfaction in Buyer's sole discretion, concerning all aspects of the Property, including its physical condition; the presence of or absence of any hazardous substances; the contracts and leases affecting the property; the potential financial performance of the Property; the availability of government permits and approvals; and the feasibility of the Property for Buyer's intended purpose. This Agreement shall terminate and Buyer shall receive a refund of the earnest money unless Buyer gives written notice to Seller within _____ days (30 days if not filled in) (the "Feasibility Period") of Mutual Acceptance stating that this condition is satisfied. If such notice is timely given, the feasibility contingency stated in this Section 5 shall be deemed to be satisfied.

    a. **Books, Records, Leases, Agreements.** Seller shall make available for inspection by Buyer and its agents within _____ days (2 days if not filled in) after Mutual Acceptance all documents in Seller's possession or control relating to the ownership, operation, renovation or development of the Property, excluding appraisals or other statements of value, and including: statements for real estate taxes, assessments, and utilities for the last three years and year to date; property management agreements and any other agreements with professionals or consultants; leases or other agreements relating to occupancy of all or a portion of the Property and a suite-by-suite schedule of tenants, rents, prepaid rents, deposits and fees; plans, specifications, permits, applications, drawings, surveys, and studies; maintenance records, accounting records and audit reports for the last three years and year to date; and "Vendor Contracts" which shall include maintenance or service contracts, and installments purchase contracts or leases of personal property or fixtures used in connection with the Property. Buyer shall determine within the Feasibility Period: (i) whether Seller will agree to terminate any objectionable Vendor Contracts; and (ii) whether Seller will agree to pay any damages or penalties resulting from the termination of objectionable Vendor Contracts. Buyer's waiver of the Feasibility Contingency shall be deemed Buyer's acceptance of all Vendor Contracts which Seller has not agreed in writing to terminate. Buyer shall be solely responsible for obtaining any required consents to such assumption

INITIALS: BUYER _____ DATE 4-28-11    SELLER _____ DATE 4-28-20

         BUYER _____ DATE _____    SELLER _____ DATE 4-28-11

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED



CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 3 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

and the payment of any assumption fees. Seller shall cooperate with Buyer's efforts to receive any such consents but shall not be required to incur any out-of-pocket expenses or liability in doing so. Seller shall transfer the Vendor Contracts as provided in Section 17.

b. **Access.** Seller shall permit Buyer and its agents, at Buyer's sole expense and risk to enter the Property at reasonable times subject to the rights of and after legal notice to tenants, to conduct inspections concerning the Property and Improvements, including without limitation, the structural condition of improvements, hazardous materials, pest infestation, soils conditions, sensitive areas, wetlands, or other matters affecting the feasibility of the Property for Buyer's intended use. Buyer shall schedule any entry onto the Property with Seller in advance and shall comply with Seller's reasonable requirements including those relating to security, confidentiality, and disruption of Seller's tenants. Buyer shall not perform any invasive testing including environmental inspections beyond a phase I assessment or contact the tenants or property management personnel without obtaining the Seller's prior written consent, which shall not be unreasonably withheld. Buyer shall restore the Property and improvements to the same condition they were in prior to inspection. Buyer shall be solely responsible for all costs of its inspections and feasibility analysis and has no authority to bind the Property for purposes of statutory liens. Buyer agrees to indemnify and defend Seller from all liens, costs, claims, and expenses, including attorneys' and experts' fees, arising from or relating to entry onto or inspection of the Property by Buyer and its agents. This agreement to indemnify and defend Seller shall survive closing. Buyer may continue to enter the Property in accordance with the foregoing terms and conditions after removal or satisfaction of the feasibility contingency only for the purpose of leasing or to satisfy conditions of financing.

c. Buyer waives the right to receive a seller disclosure statement ("Form 17-Commercial") if required by RCW 64.06. However, if Seller would otherwise be required to provide Buyer with a Form 17-Commercial, and if the answer to any of the questions in the section of the Form 17-Commercial entitled "Environmental" would be "yes," then Buyer does not waive the receipt of the "Environmental" section of the Form 17-Commercial which shall be provided by Seller.

6. **TITLE INSURANCE.**

a. **Title Report.** Seller authorizes Buyer, its Lender, Listing Broker, Selling Broker or Closing Agent, at Seller's expense, to apply for and deliver to Buyer a ☐ standard ☐ extended (standard, if not completed) coverage owner's policy of title insurance. If an extended coverage owner's policy is specified, Buyer shall pay the increased costs associated with that policy including the excess premium over that charged for a standard coverage policy, and the cost of any survey required by the title insurer. The title report shall be issued by _____*First American Title*_____ (a title company of Seller's choice, if not completed). If Seller previously received a preliminary commitment from a title insurer that Buyer declines to use, Buyer shall pay any cancellation fee owing to the original title insurer. Otherwise, the party applying for title insurance shall pay any title cancellation fee, in the event such a fee is assessed.

b. **Permitted Exceptions.** Buyer shall notify Seller of any objectionable matters in the title report or any supplemental report within the earlier of: (1) twenty (20) days after Mutual Acceptance of this Agreement; or (2) the expiration of the Feasibility Period. This Agreement shall terminate and Buyer shall receive a refund of the earnest money, less any costs advanced or committed for Buyer, unless within five (5) days of Buyer's notice of such objections (1) Seller agrees, in writing, to remove all objectionable provisions or (2) Buyer notifies Seller that Buyer waives any objections which Seller does not agree to remove. If any new title matters are disclosed in a supplemental title report, then the preceding termination, objection and waiver provisions shall apply to the new title matters except that Buyer's notice of objections shall be delivered within five (5) days of delivery of the supplemental report and Seller's response or Buyer's waiver must be delivered within two (2) days of Buyer's notice of objections. The closing date shall be extended to the extent necessary to

INITIALS: BUYER _____ DATE _4-28-11_    SELLER _____ DATE _4-28-2011_

BUYER _____ DATE _____    SELLER _____ DATE _4-28-11_

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED 

CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 4 of 13

### COMMERCIAL & INVESTMENT REAL ESTATE
### PURCHASE & SALE AGREEMENT
### (CONTINUED)

permit time for these notices. Buyer shall not be required to object to any mortgage or deed of trust liens, or the statutory lien for real property taxes, and the same shall not be deemed to be Permitted Exceptions; provided, however, that the lien securing any financing which Buyer has agreed to assume shall be a Permitted Exception. Except for the foregoing, those provisions not objected to or for which Buyer waived its objections shall be referred to collectively as the "Permitted Exceptions." Seller shall cooperate with Buyer and the title company to clear objectionable title matters but shall not be required to incur any out-of-pocket expenses or liability other than payment of monetary encumbrances not assumed by Buyer and proration of real property taxes, and Seller shall provide an owner's affidavit containing the information and reasonable covenants requested by the title company. The title policy shall contain no exceptions other than the General Exclusions and Exceptions common to such form of policy and the Permitted Exceptions.

7. **CLOSING OF SALE.** This sale shall be closed on ~~April 30, 2011~~ ("Closing") by _First American Title_ ("Closing Agent") (Seller shall select the Closing Agent, if not completed). Buyer and Seller shall deposit with Closing Agent by 12:00 p.m. on the scheduled Closing date all instruments and monies required to complete the purchase in accordance with this Agreement. "Closing" shall be deemed to have occurred when the deed is recorded and the sale proceeds are available to Seller. Time is of the essence in the performance of this Agreement. Sale proceeds shall be considered available to Seller, even though they cannot be disbursed to Seller until the next business day after Closing. Notwithstanding the foregoing, if Seller informed Buyer during the Feasibility Period that Seller's underlying financing requires that it be defeased and may not be paid off, then Closing shall be conducted in accordance with the three-day closing process described in CBA Form PS_D. This Agreement is intended to constitute escrow instructions to Closing Agent. Buyer and Seller will provide any supplemental instructions requested by Closing Agent provided the same are consistent with this Agreement.

8. **CLOSING COSTS AND PRORATIONS.** Seller shall deliver an updated rent roll to Closing Agent not later than two (2) days before the scheduled Closing date in the form required by Section 5(a) and any other information reasonably requested by Closing Agent to allow Closing Agent to prepare a settlement statement for Closing. Seller certifies that the information contained in the rent roll is correct as of the date submitted. Seller shall pay the premium for the owner's standard coverage title policy. Buyer shall pay the excess premium attributable to any extended coverage or endorsements requested by Buyer, and the cost of any survey required in connection with the same. Seller and Buyer shall each pay one-half of the escrow fees. Any real estate excise taxes shall be paid by the party who bears primary responsibility for payment under the applicable statute or code. Real and personal property taxes and assessments payable in the year of closing; collected rents on any existing tenancies; interest; utilities; and other operating expenses shall be pro-rated as of Closing. If tenants pay any of the foregoing expenses directly, then Closing Agent shall only pro rate those expenses paid by Seller. Buyer shall pay to Seller at Closing an additional sum equal to any utility deposits or mortgage reserves for assumed financing for which Buyer receives the benefit after Closing. Buyer shall pay all costs of financing including the premium for the lender's title policy. If the Property was taxed under a deferred classification prior to Closing, then Seller shall pay all taxes, interest, penalties, deferred taxes or similar items which result from removal of the Property from the deferred classification. At Closing, all refundable deposits on tenancies shall be credited to Buyer or delivered to Buyer for deposit in a trust account if required by state or local law. Buyer shall pay any sales or use tax applicable to the transfer of personal property included in the sale.

a. **Unpaid Utility Charges.** Buyer and Seller ☒ WAIVE ☐ DO NOT WAIVE (do not waive if neither box checked) the right to have the Closing Agent disburse closing funds necessary to satisfy unpaid utility charges affecting the Property pursuant to RCW 60.80. If "do not waive" is checked, then attach CBA Form UA ("Utility Charges" Addendum) to this Agreement.

INITIALS: BUYER _ Qc_ DATE _4-28-11_     SELLER _7-28-201L_ DATE _4-28-2011_

BUYER _____ DATE _____     SELLER _DH_ DATE _4-28-11_

Form generated by: TrueForms™   www.TrueForms.com   800-499-9612

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED



CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 5 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
## (CONTINUED)

9. **POST-CLOSING ADJUSTMENTS, COLLECTIONS, AND PAYMENTS.** After Closing, Buyer and Seller shall reconcile the actual amount of revenues or liabilities upon receipt or payment thereof to the extent those items were prorated or credited at Closing based upon estimates. Any bills or invoices received by Buyer after Closing which relate to services rendered or goods delivered to the Seller or the Property prior to Closing shall be paid by Seller upon presentation of such bill or invoice. At Buyer's option, Buyer may pay such bill or invoice and be reimbursed the amount paid plus interest at the rate of 12% per annum beginning fifteen (15) days from the date of Buyer's written demand to Seller for reimbursement until such reimbursement is made. Notwithstanding the foregoing, if tenants pay certain expenses based on estimates subject to a post-closing reconciliation to the actual amount of those expenses, then Buyer shall be entitled to any surplus and shall be liable for any credit resulting from the reconciliation. Rents collected from each tenant after Closing shall be applied first to rentals due most recently from such tenant for the period after closing, and the balance shall be applied for the benefit of Seller for delinquent rentals owed for a period prior to closing. The amounts applied for the benefit of Seller shall be turned over by Buyer to Seller promptly after receipt. Seller shall be entitled to pursue any lawful methods of collection of delinquent rents but shall have no right to evict tenants after Closing.

10. **OPERATIONS PRIOR TO CLOSING.** Prior to Closing, Seller shall continue to operate the Property in the ordinary course of its business and maintain the Property in the same or better condition than as existing on the date of Mutual Acceptance but shall not be required to repair material damage from casualty except as otherwise provided in this Agreement. After the Feasibility Period, Seller shall not enter into or modify existing rental agreements or leases (except that Seller may enter into, modify, extend, renew or terminate residential rental agreements or residential leases in the ordinary course of its business), service contracts, or other agreements affecting the Property which have terms extending beyond Closing without first obtaining Buyer's consent, which shall not be unreasonably withheld.

11. **POSSESSION.** Buyer shall be entitled to possession ☒ on closing ☐ _____ (on closing, if not completed). Buyer shall accept possession subject to all tenancies disclosed to Buyer during the Feasibility Period.

12. **SELLER'S REPRESENTATIONS.** Except as disclosed to or known by Buyer prior to the satisfaction or waiver of the feasibility contingency stated in Section 5 above, including in the books, records and documents made available to Buyer, or in the title report or any supplemental report or documents referenced therein, Seller represents to Buyer that, to the best of Seller's actual knowledge, each of the following is true as of the date hereof: (a) Seller is authorized to enter into the Agreement, to sell the Property, and to perform its obligations under the Agreement; (b) The books, records, leases, agreements and other items delivered to Buyer pursuant to this Agreement comprise all material documents in Seller's possession or control regarding the operation and condition of the Property; (c) Seller has not received any written notices that the Property or the business conducted thereon violate any applicable laws, regulations, codes and ordinances; (d) Seller has all certificates of occupancy, permits, and other governmental consents necessary to own and operate the Property for its current use; (e) There is no pending or threatened litigation which would adversely affect the Property or Buyer's ownership thereof after Closing; (f) There is no pending or threatened condemnation or similar proceedings affecting the Property, and the Property is not within the boundaries of any planned or authorized local improvement district; (g) Seller has paid (except to the extent prorated at Closing) all local, state and federal taxes (other than real and personal property taxes and assessments described in Section 8 above) attributable to the period prior to closing which, if not paid, could constitute a lien on Property (including any personal property), or for which Buyer may be held liable after Closing; (h) Seller is not aware of any concealed material defects in the Property except as disclosed to Buyer in writing during the Feasibility Period; (i) There are no Hazardous Substances (as defined below) currently located in, on, or under the Property in a manner or quantity that presently violates any Environmental Law (as defined below); there are no underground storage tanks located on the Property; and there is no pending or threatened investigation or

INITIALS: BUYER _~X~_ DATE _4-28-11_ SELLER _(illegible)_ DATE _4-25-2011_

BUYER _____ DATE _____ SELLER _____ DATE _4-28-11_

Form generated by: TrueForms™   www.TrueForms.com   800-499-9612

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED

CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 8 of 13

COMMERCIAL & INVESTMENT REAL ESTATE
PURCHASE & SALE AGREEMENT
(CONTINUED)

remedial action by any governmental agency regarding the release of Hazardous Substances or the violation of Environmental Law at the Property. As used herein, the term "Hazardous Substances" shall mean any substance or material now or hereafter defined or regulated as a hazardous substance, hazardous waste, toxic substance, pollutant, or contaminant under any federal, state, or local law, regulation, or ordinance governing any substance that could cause actual or suspected harm to human health or the environment ("Environmental Law"). The term "Hazardous Substances" specifically includes, but is not limited to, petroleum, petroleum by-products, and asbestos.

If prior to Closing Seller or Buyer discovers any information which would cause any of the representations above to be false if the same were deemed made as of the date of such discovery, then the party discovering the same shall promptly notify the other party in writing. If the newly-discovered information will result in costs or liability to Buyer in excess of the lesser of $100,000 or five percent (5%) of the purchase price stated in this Agreement, or will materially adversely affect Buyer's intended use of the Property, then Buyer shall have the right to terminate the Agreement and receive a refund of its earnest money. Buyer shall give notice of termination within five (5) days of discovering or receiving written notice of the new information. Nothing in this paragraph shall prevent Buyer from pursuing its remedies against Seller if Seller had actual knowledge of the newly-discovered information such that a representation provided for above was false.

13. **AS-IS.** Except for those representations and warranties specifically included in this Agreement: (i) Seller makes no representations or warranties regarding the Property; (ii) Seller hereby disclaims, and Buyer hereby waives, any and all representations or warranties of any kind, express or implied, concerning the Property or any portion thereof, as to its condition, value, compliance with laws, status of permits or approvals, existence or absence of hazardous material on site, occupancy rate or any other matter of similar or dissimilar nature relating in any way to the Property, including the warranties of fitness for a particular purpose, tenantability, habitability and use; (iii) Buyer otherwise takes the Property "AS IS;" and (iv) Buyer represents and warrants to Seller that Buyer has sufficient experience and expertise such that it is reasonable for Buyer to rely on its own pre-closing inspections and investigations.

14. **PERSONAL PROPERTY.**
   a. This sale includes all right, title and interest of Seller to the following tangible personal property: ☒ None ☐ That portion of the personal property located on and used in connection with the Property, which Seller will itemize in an Exhibit to be attached to this Agreement within ten (10) days of Mutual Acceptance (None, if not completed). The value assigned to the personal property shall be $_____ (if not completed, the County-assessed value if available, and if not available, the fair market value determined by an appraiser selected by the Listing Broker and Selling Broker). Seller warrants title to, but not the condition of, the personal property and shall convey it by bill of sale.
   b. In addition to the leases and Vendor Contracts assumed by Buyer pursuant to Section 5(a) above, this sale includes all right, title and interest of Seller to the following intangible property now or hereafter existing with respect to the Property including without limitation: all rights-of-way, rights of ingress or egress or other interests in, on, or to, any land, highway, street, road, or avenue, open or proposed, in, on, or across, in front of, abutting or adjoining the Property; all rights to utilities serving the Property; all drawings, plans, specifications and other architectural or engineering work product; all governmental permits, certificates, licenses, authorizations and approvals; all rights, claims, causes of action, and warranties under contracts with contractors, engineers, architects, consultants or other parties associated with the Property; all utility, security and other deposits and reserve accounts made as security for the fulfillment of any of Seller's obligations; any name of or telephone numbers for the Property and related trademarks, service marks or trade dress; and guaranties, warranties or other assurances of performance received.

INITIALS: BUYER _Sc_ DATE _4-28-11_ SELLER _____ DATE _4-28-2011_
BUYER _____ DATE _____ SELLER _____ DATE _4-28-11_

Form generated by: TrueForms™ www.TrueForms.com 800-499-9612

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED



## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

15. **CONDEMNATION AND CASUALTY.** Seller bears all risk of loss until Closing, and thereafter Buyer shall bear the risk of loss. Buyer may terminate this Agreement and obtain a refund of the earnest money if improvements on the Property are destroyed or materially damaged by casualty before Closing, or if condemnation proceedings are commenced against all or a portion of the Property before Closing. Damage will be considered material if the cost of repair exceeds the lesser of $100,000 or five percent (5%) of the purchase price stated in this Agreement. Alternatively, Buyer may elect to proceed with closing, in which case, at Closing, Seller shall assign to Buyer all claims and right to proceeds under any property insurance policy and shall credit to Buyer at Closing the amount of any deductible provided for in the policy.

16. **FIRPTA - TAX WITHHOLDING AT CLOSING.** Closing Agent is instructed to prepare a certification (CBA or NWMLS Form 22E, or equivalent) that Seller is not a "foreign person" within the meaning of the Foreign Investment in Real Property Tax Act, and Seller shall sign it on or before Closing. If Seller is a foreign person, and this transaction is not otherwise exempt from FIRPTA, Closing Agent is instructed to withhold and pay the required amount to the Internal Revenue Service.

17. **CONVEYANCE.** Title shall be conveyed by a Statutory Warranty Deed subject only to the Permitted Exceptions. If this Agreement is for conveyance of Seller's vendee's interest in a Real Estate Contract, the Statutory Warranty Deed shall include a contract vendee's assignment sufficient to convey after acquired title. At Closing, Seller and Buyer shall execute and deliver to Closing Agent CBA Form No. PS-AS Assignment and Assumption Agreement transferring all leases and Vendor Contracts assumed by Buyer pursuant to Section 5(a) and all intangible property transferred pursuant to Section 14(b).

18. **NOTICES AND COMPUTATION OF TIME.** Unless otherwise specified, any notice required or permitted in, or related to, this Agreement (including revocations of offers and counteroffers) must be in writing. Notices to Seller must be signed by at least one Buyer and must be delivered to Seller and Listing Broker with a courtesy copy to any other party identified as a recipient of notices in Section 28. A notice to Seller shall be deemed delivered only when received by Seller, Listing Broker, or the licensed office of Listing Broker. Notices to Buyer must be signed by at least one Seller and must be delivered to Buyer, with a copy to Selling Broker and with a courtesy copy to any other party identified as a recipient of notices in Section 28. A notice to Buyer shall be deemed delivered only when received by Buyer, Selling Broker, or the licensed office of Selling Broker. Selling Broker and Listing Broker have no responsibility to advise of receipt of a notice beyond either phoning the represented party or causing a copy of the notice to be delivered to the party's address provided in this Agreement. Buyer and Seller shall keep Selling Broker and Listing Broker advised of their whereabouts in order to receive prompt notification of receipt of a notice. If any party is not represented by a licensee, then notices must be delivered to and shall be effective when received by that party at the address, fax number, or email indicated in Section 28.

Unless otherwise specified in this Agreement, any period of time in this Agreement shall mean Pacific Time and shall begin the day after the event starting the period and shall expire at 6:00 p.m. of the last calendar day of the specified period of time, unless the last day is a Saturday, Sunday or legal holiday as defined in RCW 1.16.050, in which case the specified period of time shall expire on the next day that is not a Saturday, Sunday or legal holiday. Any specified period of five (5) days or less shall not include Saturdays, Sundays or legal holidays. Notwithstanding the foregoing, references to specific dates or times or number of hours shall mean those dates, times or number of hours; provided, however, that if the Closing Date falls on a Saturday, Sunday, or legal holiday as defined in RCW 1.16.050, or a date when the county recording office is closed, then the Closing Date shall be the next regular business day.

INITIALS: BUYER _____ DATE _4-28-11_ SELLER _____ DATE _4-28-2011_
         BUYER _____ DATE _____ SELLER _____ DATE _4-28-11_

Form generated by: TrueForms™    www.TrueForms.com    800-499-9612

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED

CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 8 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
### PURCHASE & SALE AGREEMENT
#### (CONTINUED)

**19. AGENCY DISCLOSURE.** At the signing of this Agreement,

Selling Broker _____, _____ NA _____

Represented _____.

and the Listing Broker _____ NA _____

represented _____

Selling Firm, Selling Firm's Designated Broker, Selling Broker's Branch Manager (if any) and Selling Broker's Managing Broker (if any) represent the same party that Selling Broker represents. Listing Firm, Listing Firm's Designated Broker, Listing Broker's Branch Manager (if any), and Listing Broker's Managing Broker (if any) represent the same party that the Listing Broker represents. If Selling Broker and Listing Broker are different persons affiliated with the same Firm, then both Buyer and Seller confirm their consent to the Brokers' Designated Broker, Branch Manager (if any), and Managing Broker (if any) representing both parties as a dual agent. If Selling Broker and Listing Broker are the same person representing both parties, then both Buyer and Seller confirm their consent to that person and his/her Designated Broker, Branch Manager (if any), and Managing Broker (if any) representing both parties as dual agents. All parties acknowledge receipt of the pamphlet entitled "The Law of Real Estate Agency."

**20. ASSIGNMENT.** Buyer ☐ may ☒ may not (may not, if not completed) assign this Agreement, or Buyer's rights hereunder, without Seller's prior written consent, unless provided otherwise herein. If the "may not" option is selected and the words "and/or assigns" or similar words are used to identify the Buyer, then this Agreement may be assigned with notice to Seller but without Seller's consent only to an entity which is controlled by or under common control with the Buyer identified in this Agreement. Any other assignment requires Seller's consent. The party identified as the Initial Buyer shall remain responsible for those obligations of Buyer stated in this Agreement notwithstanding any assignment and, if this Agreement provides for Seller to finance a portion of the purchase price, then the party identified as the Initial Buyer shall guarantee payment of the Seller financing.

**21. DEFAULT AND ATTORNEY'S FEE.**

(a) Buyer's default. In the event Buyer fails, without legal excuse, to complete the purchase of the Property, then (*check one*):

☒ Seller may terminate this Agreement and keep the earnest money as liquidated damages as the sole and exclusive remedy available to Seller for such failure; or

☐ Seller may, at its option, (a) terminate this Agreement and keep as liquidated damages the earnest money as the sole and exclusive remedy available to Seller for such failure, (b) bring suit against Buyer for Seller's actual damages, (c) bring suit to specifically enforce this Agreement and recover any incidental damages, or (d) pursue any other rights or remedies available at law or equity.

(b) Seller's default. In the event Seller fails, without legal excuse, to complete the sale of the Property, then ( *check one*):

☒ As Buyer's sole remedy, Buyer may either (a) terminate this Agreement and recover all earnest money or fees paid by Buyer whether or not the same are identified as refundable or applicable to the purchase price; or (b) bring suit to specifically enforce this Agreement and recover incidental damages, provided, however, Buyer must file suit within sixty (60) days from the scheduled date of closing or from the date Seller has informed Buyer in writing that Seller will not proceed with closing, whichever is earlier; or

☐ Buyer may, at its option, (a) bring suit against Seller for Buyer's actual damages, (b) bring suit to specifically enforce this Agreement and recover any incidental damages, or (c) pursue any other rights or remedies available at law or equity.

INITIALS: BUYER _Sc____ DATE _4-28-11_  SELLER _____ DATE _6-28-2011_

BUYER _____ DATE _____  SELLER _____ DATE _4-28-11_

Form generated by: TrueForms™  www.TrueForms.com  800-499-9612

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED

CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 9 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

Neither Buyer nor Seller may recover consequential damages such as lost profits. If Buyer or Seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonable attorneys' fees and expenses. In the event of trial, the amount of the attorney's fee shall be fixed by the court. The venue of any suit shall be the county in which the Property is located, and this Agreement shall be governed by the laws of the state where the Property is located.

22. **MISCELLANEOUS PROVISIONS.**

a. **Complete Agreement.** This Agreement and any addenda and exhibits thereto state the entire understanding of Buyer and Seller regarding the sale of the Property. There are no verbal or other written agreements which modify or affect the Agreement.

b. **Counterpart Signatures.** This Agreement may be signed in counterpart, each signed counterpart shall be deemed an original, and all counterparts together shall constitute one and the same agreement.

c. **Electronic Delivery.** Electronic delivery of documents (e.g., transmission by facsimile or email) including signed offers or counteroffers and notices shall be legally sufficient to bind the party the same as delivery of an original. At the request of either party, or the Closing Agent, the parties will replace electronically delivered offers or counteroffers with original documents.

d. **Section 1031 Like-Kind Exchange.** If either Buyer or Seller intends for this transaction to be a part of a Section 1031 like-kind exchange, then the other party agrees to cooperate in the completion of the like-kind exchange so long as the cooperating party incurs no additional liability in doing so, and so long as any expenses (including attorneys fees and costs) incurred by the cooperating party that are related only to the exchange are paid or reimbursed to the cooperating party at or prior to Closing. Notwithstanding Section 20 above, any party completing a Section 1031 like-kind exchange may assign this Agreement to its qualified intermediary or any entity set up for the purposes of completing a reverse exchange.

23. **ACCEPTANCE; COUNTEROFFERS.** Seller has until midnight of _____ (If not filled in, the third business day) following the day Buyer delivers the offer to accept this offer, unless sooner withdrawn. If this offer is not timely accepted, it shall lapse and the earnest money shall be refunded to Buyer. If either party makes a future counteroffer, the other party shall have until 5:00p.m. on the _____ business day (If not filled in, the second business day) following receipt to accept the counteroffer, unless sooner withdrawn. If the counteroffer is not timely accepted or countered, this Agreement shall lapse and the earnest money shall be refunded to the Buyer. No acceptance, offer or counteroffer from the Buyer is effective until a signed copy is received by the Seller, the Listing Broker or the licensed office of the Listing Broker. No acceptance, offer or counteroffer from the Seller is effective until a signed copy is received by the Buyer, the Selling Broker or the licensed office of the Selling Broker. "Mutual Acceptance" shall occur when the last counteroffer is signed by the offeree, and the fully-signed counteroffer has been received by the offeror, his or her broker, or the licensed office of the broker. If any party is not represented by a broker, then notices must be delivered to and shall be effective when received by that party.

24. **INFORMATION TRANSFER.** In the event this Agreement is terminated, Buyer agrees to deliver to Seller within ten (10) days of Seller's written request copies of all materials received from Seller and any non-privileged plans, studies, reports, inspections, appraisals, surveys, drawings, permits, applications or other development work product relating to the Property in Buyer's possession or control as of the date this Agreement is terminated.

INITIALS: BUYER _____ DATE _4-28-11_ SELLER _____ DATE _4/28/2011_

BUYER _____ DATE _____ SELLER _____ DATE _4-28-11_

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED

CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 10 of 13



## COMMERCIAL & INVESTMENT REAL ESTATE
### PURCHASE & SALE AGREEMENT
### (CONTINUED)

25. **CONFIDENTIALITY.** Until and unless closing has been consummated, Buyer and Seller shall follow reasonable measures to prevent unnecessary disclosure of information obtained in connection with the negotiation and performance of this Agreement. Neither party shall use or knowingly permit the use of any such information in any manner detrimental to the other party.

26. **SELLER'S ACCEPTANCE AND BROKERAGE AGREEMENT.** Seller agrees to sell the Property on the terms and conditions herein, and further agrees to pay a commission in a total amount computed in accordance with the listing or commission agreement. If there is no written listing or commission agreement, Seller agrees to pay a commission of __NA__ % of the sales price or $_____. The commission shall be apportioned between Listing Firm and Selling Firm as specified in the listing or any co-brokerage agreement. If there is no listing or written co-brokerage agreement, then Listing Firm shall pay to Selling Firm a commission of _____% of the sales price or $_____. Seller assigns to Listing Firm and Selling Firm a portion of the sales proceeds equal to the commission. If the earnest money is retained as liquidated damages, any costs advanced or committed by Listing Firm or Selling Firm for Buyer or Seller shall be reimbursed or paid therefrom, and the balance be paid one-half to Seller and one-half to Listing Firm and Selling Firm according to the listing agreement and any co-brokerage agreement. In any action by Listing Firm or Selling Firm to enforce this Section, the prevailing party is entitled to reasonable attorneys' fees and expenses. Neither Listing Firm nor Selling Firm are receiving compensation from more than one party to this transaction unless disclosed on an attached addendum, in which case Buyer and Seller consent to such compensation. The Property described in attached Exhibit A is commercial real estate. Notwithstanding Section 25 above, the pages containing this Section, the parties' signatures and an attachment describing the Property may be recorded.

27. **LISTING BROKER AND SELLING BROKER DISCLOSURE.** EXCEPT AS OTHERWISE DISCLOSED IN WRITING TO BUYER OR SELLER, THE SELLING BROKER, LISTING BROKER, AND FIRMS HAVE NOT MADE ANY REPRESENTATIONS OR WARRANTIES OR CONDUCTED ANY INDEPENDENT INVESTIGATION CONCERNING THE LEGAL EFFECT OF THIS AGREEMENT, BUYER'S OR SELLER'S FINANCIAL STRENGTH, BOOKS, RECORDS, REPORTS, STUDIES, OR OPERATING STATEMENTS; THE CONDITION OF THE PROPERTY OR ITS IMPROVEMENTS; THE FITNESS OF THE PROPERTY FOR BUYER'S INTENDED USE; OR OTHER MATTERS RELATING TO THE PROPERTY, INCLUDING WITHOUT LIMITATION, THE PROPERTY'S ZONING, BOUNDARIES, AREA, COMPLIANCE WITH APPLICABLE LAWS (INCLUDING LAWS REGARDING ACCESSIBILITY FOR DISABLED PERSONS), OR HAZARDOUS OR TOXIC MATERIALS INCLUDING MOLD OR OTHER ALLERGENS. SELLER AND BUYER ARE EACH ADVISED TO ENGAGE QUALIFIED EXPERTS TO ASSIST WITH THESE DUE DILIGENCE AND FEASIBILITY MATTERS, AND ARE FURTHER ADVISED TO SEEK INDEPENDENT LEGAL AND TAX ADVICE RELATED TO THIS AGREEMENT.

INITIALS: BUYER __Z__ DATE __4-28-11__ SELLER _____ DATE __4-28-2011__
BUYER _____ DATE _____ SELLER _____ DATE __4-28-11__

Form generated by: TrueForms™   www.TrueForms.com   800-499-9612

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED

CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 11 of 13

# COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

**28. IDENTIFICATION OF THE PARTIES.** The following is the contact information for the parties involved in this Agreement:

**Buyer**
Contact: _Carter Family and Carter, LLC_
Address: _____

Business Phone: _____
Mobile Phone: _____
Fax: _____
Email: _____

**Seller**
Contact: _Harry and Rosalie Yourist_
Address: _935 N. 175th,_
_Shorelin, WA, 98133_
Business Phone: _206-542-6022_
Mobile Phone: _425-275-1038_
Fax: _206-546-6855_
Email: _shorelineshell@hotmail.com_

**Selling Firm**
Name: _NA_
Assumed Name (if applicable): _____
Selling Broker: _____
Address: _____

Business Phone: _____
Mobile Phone: _____
Email: _____
Fax: _____
MLS Office No.: _____

**Listing Firm**
Name: _NA_
Assumed Name (if applicable): _____
Listing Broker: _____
Address: _____

Business Phone: _____
Mobile Phone: _____
Email: _____
Fax: _____
MLS Office No.: _____

**Licensed Office of Selling Broker**
Address: _____

Business Phone: _____
Mobile Phone: _____
Fax: _____
CBA Office No.: _____

**Licensed Office of Listing Broker**
Address: _____

Business Phone: _____
Mobile Phone: _____
Fax: _____
CBA Office No.: _____

**Courtesy Copy of Notices to Buyer to:**
Name: _____
Address: _____

Business Phone: _____
Fax: _____
Mobile Phone: _____
Email: _____

**Courtesy Copy of Notices to Seller to:**
Name: _____
Address: _____

Business Phone: _____
Fax: _____
Mobile Phone: _____
Email: _____

INITIALS: BUYER _X_ DATE _4-28-1_    SELLER _____ DATE _4-28-2011_
BUYER _____ DATE _____    SELLER _____ DATE _4-28-11_

Form generated by: TrueForms™  www.TrueForms.com  800-499-9612

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED

CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 12 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
## (CONTINUED)

IN WITNESS WHEREOF, the parties have signed this Agreement intending to be bound.

Buyer _Sara Carter Carter and Carter LLC_        Buyer _____
       Printed name and type of entity                    Printed name and type of entity

Buyer _Sara Carter_                              Buyer _____
       Signature and title                                Signature and title

Date signed _4-28-11_                            Date signed _____


Seller _____Harry Yourist_____              Seller _____Rosalie Yourist_____
       Printed name and type of entity                    Printed name and type of entity

Seller _Harry Yourist (owner)_                   Seller _Janice Yourist (owner)_
       Signature and title                                Signature and title

Date signed _4-28-2011_                          Date signed _4-28-2011_

EXHIBIT "A"
LEGAL DESCRIPTION


THAT PORTION OF THE NORTH HALF OF THE NORTHEAST QUARTER OF
THE SOUTHWEST QUARTER OF SECTION 7, TOWHSHIP 26 NORTH, RANGE 4
EAST, W.M., IN KING COUNTY, WA. DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF THE SOUTHWEST
QUARTER OF SAID SECTION 7; THENCE N 89°02'52" W ALONG THE NORTH
LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 7 FOR A DISTANCE
OF 294.29 FEET; THENCE S 00°16'04" W 43.04 FEET TO THE SOUTHERLY
LIMITS OF N. 175TH ST. AND THE POINT OF BEGINNING:

THENCE S 00°16'04" W 143.50 FEET;
THENCE N 89°02'54" W 104.92 FEET;
THENCE N 00°16'04" E 144.53 FEET TO THE SOUTHERLY LIMITS OF N. 175TH
ST;
THENCE S 89°02'52" E ALONG NO. 175TH ST FOR A DISTANCE OF 57.76 FEET;
THENCE CONTINUING ALONG THE SOUTHERLY LIMITS OF N. 175TH ST. FOR
A DISTANCE OF 47.18 FEET TO THE POINT OF BEGINNING.

(CONTAINING 15, 138 SQ FT)

SUBJECT TO ALL EASEMENTS AND RESTRICTIONS OF RECORD, IF ANY.

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED

CBA Form PS_1A
Purchase & Sale Agreement
Rev. 1/2011
Page 13 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

### EXHIBIT A*
[Legal Description]

\* To ensure accuracy in the legal description, consider substituting the legal description contained in the preliminary commitment for title insurance or a copy of the Property's last vesting deed for this page. Do not neglect to label the substitution "Exhibit A." You should avoid transcribing the legal description because any error in transcription may render the legal description inaccurate and this Agreement void and unenforceable.

INITIALS: BUYER _____ DATE _4-28-11_ SELLER _____ DATE _4-28-2011_

BUYER _____ DATE _____ SELLER _____ DATE _4-28-11_

Form generated by: TrueForms™   www.TrueForms.com   800-499-9612

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED

CBA Form VLA
Vacant Land Addendum
Rev. 1/2011
Page 1 of 2

# VACANT LAND ADDENDUM

The following is part of the Purchase and Sale Agreement dated _____ *April 1, 2001* _____ (the "Agreement")
between _____ *Harry and Rosalie Yourist* _____ ("Seller") and
_____ *Carter Family and Carter, LLC* _____ ("Buyer"), regarding the sale of the Property
known as: *935 North 175th, Shoreline WA. 98133* _____ (the "Property").

1. **Closing Date.** Closing shall be _____ days (30 days if not filled in) after the following selected events have
   occurred. However, under no circumstances may Closing occur before the final plat for the Property is
   recorded or after _____, at which time the Agreement shall terminate and the earnest
   money shall be refunded to Buyer.
   ☐ removal or satisfaction of the feasibility contingency in Paragraph 5 of the Agreement
   ☐ removal of any governmental moratoria which would prevent construction activities from commencing on
   the Property on and after closing
   ☐ Buyer obtains a ☐ master use permit ☐ grade and fill permit ☐ building permit for Buyer's intended
   development of the Property
   ☐ other _____.

2. **Extensions.** Buyer may extend the Closing date for up to _____ periods of _____ days each (each an
   "Extension Period") upon payment of an extension fee of $_____ for each Extension Period. Each
   extension fee shall be paid to ☐ Seller ☐ closing agent (Seller if not filled in) on or before the start of the
   Extension Period. The extension fees ☐ shall ☐ shall not (shall not if not filled in) apply to the purchase
   price, and shall be non-refundable unless a) if Seller defaults, or b) this Agreement terminates because the
   final plat of the Property was not recorded before the then-current Closing date.

3. **Subdivision and Development Contingencies.** This Agreement shall terminate and Buyer shall receive a
   refund of the earnest money unless Buyer gives written notice to Seller within _____ days after mutual
   acceptance (120 days if not filled in) stating that Buyer is reasonably satisfied that the following selected
   matters have occurred:
   ☐ preliminary plat approval for the Property
   ☐ recording of a final plat for the Property (NOTE: If local or state laws require a legal subdivision to sell the
   Property (e.g. large parcels under RCW 58.17.205), this Agreement shall be contingent on recording of a
   final plat, and no earnest money or other funds, including any extension fees, shall be disbursed to Seller
   until the final plat is recorded.)
   ☐ removal of any governmental moratoria which prevent construction activities from commencing on the
   Property as of Closing
   ☐ a master use permit has been issued for the Property
   ☐ a grade and fill permit has been issued for the Property
   ☐ a building permit has been issued for the Property
   ☐ other _____.

INITIALS: BUYER _____ DATE _4-28-11_   SELLER _____ DATE _4-28-2011_
BUYER _____ DATE _____   SELLER _____ DATE _4-28-11_

Form generated by: TrueForms™   www.TrueForms.com   800-499-9612

© Commercial Brokers Association
2011
ALL RIGHTS RESERVED

CBA Form VLA
Vacant Land Addendum
Rev. 1/2011
Page 2 of 2

### VACANT LAND ADDENDUM
### (CONTINUED)

If Buyer gives timely notice, the foregoing contingencies shall be deemed satisfied. Upon removal of any inspection contingency provided in Section 5 of the Agreement, Buyer shall act diligently and in good faith to obtain the approvals and permits necessary to satisfy the foregoing contingencies. Buyer shall bear all of the costs of obtaining the foregoing permits and approvals.

4. **Cooperation.** Seller agrees to cooperate with Buyer in obtaining all permits or other governmental approvals necessary or convenient to develop the Property as contemplated by the Agreement and shall execute all documents Buyer may reasonably require, including without limitation, applications for permits or approvals; provided, however, Seller shall not be required to incur any liability or out-of-pocket expenses which are not reimbursed by Buyer. Buyer agrees to make available at Seller's reasonable request any plat maps, drawings, or information relating to applications or submittals for the Property made by Buyer to any governmental agency.

5. **Buyer's Pre-Closing Development Work.** If the Agreement contemplates that Buyer will perform work on the Property prior to closing (e.g., to satisfy conditions of final plat approval), then Buyer's right to entry under Section 5b of the Agreement and Seller's duty of cooperation under Section 4 of this Addendum shall extend to those pre-closing construction and development activities. Any studies, inspections or improvements shall be accomplished at the Buyer's expense. Buyer agrees to indemnify and defend Seller from all liens, costs, claims, and expenses, including attorney's and expert's fees, arising from or relating to entry onto the Property by Buyer or its agents. This agreement to indemnify and defend Seller shall survive closing or termination of the Agreement.

6. **Seller's Acts.** Seller shall not create or permit to be created any lien or encumbrance against any portion of the Property, except for encumbrances existing on the date of mutual acceptance of the Agreement, the lien of real property taxes and assessments that are not delinquent, and statutory liens that result from the activities of Buyer in connection with the Property. Seller shall continue to pay when due all such prior encumbrances and shall not suffer or permit a default to arise under those prior encumbrances.

If Seller fails to timely pay any such tax, assessment or prior encumbrance or if any encumbrance arises against the Property after mutual acceptance of this Agreement, then Buyer may (but has no obligation to) pay all or any part of those taxes, assessments or encumbrances and may deduct amounts so paid from the purchase price at Closing. In the event the Agreement does not close through no fault of Buyer, Seller shall immediately reimburse Buyer for and taxes, assessments or encumbrances so paid by Buyer.

In the event that the Property has been placed in a forestry, agricultural or open space tax classification, Seller shall remove the Property from said classification and the escrow agent shall pay any additional taxes, applicable interest, and penalties caused by reclassification from Seller's proceeds at Closing.

7. **Memorandum of Agreement.** Upon the request of Buyer, Seller shall execute and record a memorandum identifying the parties, the date of the Agreement, and the Closing date.

8. **Conflict.** In the event of any conflict between the terms of this Addendum and the Agreement, this Addendum shall control.

INITIALS: BUYER _X_____ DATE _4-28-11_ SELLER ____ DATE _4-28-2011_

BUYER_____ DATE_____ SELLER ____ DATE _4-28-11_

Form generated by: TrueForms℠  www.TrueForms.com  800-499-9612

## SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Amendment dated July 11, 2013, amends the Commercial & Investment Purchase and Sale Agreement ("Agreement") made as of April 28, 2011 (with the reference date of April 1, 2001 [sic]) by and between Harry and Rosalie Yourist, husband and wife ("Seller"), and Carter and Carter, LLC, a Washington limited liability company ("Buyer"), as amended by the First Amendment to purchase and Sale Agreement dated March 11, 2013, concerning property in King County, Washington, and legally described in the Agreement ("Property"). References in this Amendment to the Agreement shall refer to the Agreement as modified by the terms of this Amendment unless the context requires otherwise. To the extent the terms of this Amendment are inconsistent with the other terms of the Agreement, the terms of this Amendment shall control. Unless specifically stated otherwise, all capitalized terms in this Amendment shall have the same meaning as defined in the Agreement. Except as specifically amended herein, all of the terms, conditions and covenants of the Agreement are hereby ratified and shall continue in full force and effect.

1. Chapter 11 Filing. Seller has filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the Western District of Washington at Seattle under Bankruptcy Case No. 13-13512-KAO (the "Yourist Bankruptcy Proceeding"). Seller is operating in the Yourist Bankruptcy Proceeding as a debtor-in-possession.

2. Closing Date. Closing is hereby extended to two weeks following the date on which a plan of reorganization is confirmed by order of the Bankruptcy Court. The Closing Date may not be further extended without the written approval of Buyer and Seller.

3. Bankruptcy Court Approval Contingency. This Second Amendment shall become effective and shall be binding on Seller and Buyer, and Seller's obligation to convey the Property under this Second Amendment, is subject to and conditioned upon confirmation of a plan of reorganization in the Yourist Bankruptcy Proceeding which approves the Second Amendment and approves a sale of the Property free and clear of liens, or upon entry of an order approving this Second Amendment and authorizing the sale of the Property free and clear of liens under Section 363(b)(1) & (f) of the Bankruptcy Code prior to confirmation of a plan of reorganization.

4. Counterparts. This Amendment may be executed in any number of counterparts and all counterparts shall be deemed to constitute a single agreement. The execution of one counterpart by any party shall have the same force and effect as if that party had signed all other counterparts. This Amendment shall not be binding until all parties have signed at least one counterpart.

SELLER:                                      BUYER:

                                             Carter and Carter, LLC

_____                    
Harry Yourist                                By: _____

_____                    Its: _____
Rosalie Yourist

{00698719.1}

# Exhibit B

The Lawless Partnership
6018 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9595
Fax: (206) 782-0569

© Commercial Brokers
Association 2011
ALL RIGHTS RESERVED

CBA Form PS-1A
Purchase & Sale Agreement
Rev. 1/2011
Page 1 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
### PURCHASE & SALE AGREEMENT

*This has been prepared for submission to your attorney for review and approval prior to signing. No representation is made by licensee as to its sufficiency or its consequences.*

Reference Date: May, 2013

Carter and Carter LLC ("Buyer") agrees to buy and Harry and Rosalie Yourist ("Seller") agrees to sell, on the following terms, the commercial real estate and all improvements thereon (collectively, the "Property") commonly known as Lots A and B, 17255 Aurora Ave N in the City of Shoreline, King County, Washington, legally described on attached Exhibit A. The Reference Date above is intended to be used to reference this Agreement and is not the date of "Mutual Acceptance," which is defined in Section 23.

1.  **PURCHASE PRICE:** The purchase price is One Million Five Hundred Fifty-Eight Thousand Seven Hundred One Million Six Hundred Twenty One Thousand and Forty Eight Dollars ($1,558,709 1,621,048.00) payable as follows (check only one):

    ☒ All cash at closing with no financing contingency.

    ☐ All cash at closing contingent on new financing in accordance with the Financing Addendum (attach CBA Form PS_FIN).

    ☐ $_____ OR _____% of the purchase price in cash at closing with the balance of the purchase price paid as follows (check one or both, as applicable): ☐ Buyer's assumption of the outstanding principal balance as of the Closing Date of a first lien note and deed of trust (or mortgage), or real estate contract, in accordance with the Financing Addendum (attach CBA Form PS_FIN); ☐ Buyer's delivery at closing of a promissory note for the balance of the purchase price, secured by a deed of trust encumbering the Property, in accordance with the Financing Addendum (attach CBA Form PS_FIN).

    ☐ Other:_____

2.  **EARNEST MONEY.** The earnest money in the amount of $10,000.00 shall be in the form of: ☐ Cash ☐ Personal check ☒ Promissory note (attached CBA Form EMN) ☐ Other:_____
    The earnest money shall be held by: ☐ Selling Firm ☒ Closing Agent. Selling Broker may, however, transfer the earnest money to Closing Agent.

    Buyer shall deliver the earnest money NOTE no later than:

    ☒ 5 days after Mutual Acceptance, TO BE PAID IN ACCORDANCE WITH ITS TERMS.

    ☐ On the last day of the Feasibility Period defined in Section 5 below.

    ☐ Other:_____

    If the earnest money is to be held by Selling Firm and is over $10,000, it shall be deposited to: ☐ Selling Firm's pooled trust account (with interest paid to the State Treasurer). ☐ A separate interest bearing trust account in Selling Firm's name. The interest, if any, shall be credited at closing to Buyer; if this sale fails to close, whoever is entitled to the earnest money is entitled to interest.

    Selling Firm shall deposit any check to be held by Selling Firm within 3 days after receipt of Mutual Acceptance, whichever occurs later. Buyer agrees to pay financing and purchase costs incurred by Buyer. Unless otherwise provided in this Agreement, the earnest money shall be applicable to the purchase price.

3.  **EXHIBITS AND ADDENDA.** The following Exhibits and Addenda are made a part of this Agreement:

    ☒ Exhibit A - Legal Description
    ☒ Earnest Money Promissory Note, CBA Form EMN

| INITIALS: | Buyer | Date | Seller | Date 7/12/2013 |
|---|---|---|---|---|
| | Buyer | Date 7/1/13 | Seller | Date 2/12/13 |

© Commercial Brokers
Association 2011
ALL RIGHTS RESERVED

CBA Form PS-1A
Purchase & Sale Agreement
Rev. 12/2011
Page 2 of 13

**COMMERCIAL & INVESTMENT REAL ESTATE**
**PURCHASE & SALE AGREEMENT**
**(CONTINUED)**

- [ ] Promissory Note, LPB Form No. 28A
- [ ] Short Form Deed of Trust, LPB Form No. 20
- [ ] Deed of Trust Rider, CBA Form DTR
- [x] Utility Charges Addendum, CBA Form UA
- [ ] FIRPTA Certification, CBA Form 22E
- [ ] Assignment and Assumption, CBA Form PS-AS
- [ ] Addendum/Amendment, CBA Form PSA
- [ ] Back-Up Addendum, CBA Form BUA
- [ ] Vacant Land Addendum, CBA Form VLA
- [ ] Financing Addendum, CBA Form PS_FIN
- [ ] Tenant Estoppel Certificate, CBA Form PS_TEC
- [ ] Defeasance Addendum, CBA Form PS_D
- [x] Other Supplemental Conditions of Sale

4. **SELLER'S UNDERLYING FINANCING.** Unless Buyer is assuming Seller's underlying financing, Seller shall be responsible for confirming the existing underlying financing is not subject to any "lock out" or similar covenant which would prevent the lender's lien from being released at closing. In addition, Seller shall provide Buyer notice prior to the end of the Feasibility Period if Seller is required to substitute securities for the Property as collateral for the underlying financing (known as "defeasance"). If Seller provides this notice of defeasance to Buyer, then the parties shall close the transaction in accordance with the process described in CBA Form PS_D or any different process identified in Seller's defeasance notice to Buyer.

5. **FEASIBILITY CONTINGENCY.** Buyer's obligations under this Agreement are conditioned upon Buyer's satisfaction in Buyer's sole discretion, concerning all aspects of the Property, including its physical condition; the presence of or absence of any hazardous substances; the contracts and leases affecting the property; the potential financial performance of the Property; the availability of government permits and approvals; and the feasibility of the Property for Buyer's intended purpose. This Agreement shall terminate and Buyer shall receive a refund of the earnest money unless Buyer gives written notice to Seller within 360/100 days (30 days if not filled in) (the "Feasibility Period") of the [date of ] Mutual Acceptance, AND IT APPROVAL OF THIS AGREEMENT BY THE U.S. BANKRUPTCY COURT, stating that this condition is satisfied. If such notice is timely given, the feasibility contingency stated in this Section 5 shall be deemed to be satisfied.

a. **Books, Records, Leases, Agreements.** Seller shall make available for inspection by Buyer and its agents within 15 days (2 days if not filled in) after Mutual Acceptance all documents in Seller's possession or control relating to the ownership, operation (excluding records relating to negotiations of the business on the Property such as sales and inventory), reports or provide (however any) and all contracts that may give security interests, lien rights; or otherwise impact the property will be provided (renovation or development of the Property, excluding appraisals or other statements of value, and including statements for real estate taxes, assessments, and utilities for the last three years and year-to-date; property management agreements and any other agreements with professionals or consultants; leases or other agreements relating to occupancy of all or a portion of the Property; and a suite-by-suite schedule of tenants, rents, prepaid rents, deposits and fees; plans, specifications; permits; applications; drawings; surveys; and studies; maintenance records, accounting records and audit reports for the last three years and year to date; and "Vendor Contracts" which shall include maintenance or service contracts, and installments, purchase contracts or leases of personal property or fixtures used in connection with the Property. Buyer shall determine within the Feasibility Period (i) whether Seller will agree to terminate any objectionable Vendor Contracts; and (ii) whether Seller will agree to pay any damages or penalties resulting from the termination of objectionable Vendor Contracts. Buyer's waiver of the Feasibility Contingency shall be deemed Buyer's acceptance of all Vendor Contracts which Seller has not agreed in writing to terminate. Buyer shall be

INITIALS: Buyer _____ Date 7/12/13   Seller _____ Date 7/12/2013
Buyer _____ Date _____   Seller _____ Date 7/13/13

The Lawless Partnership
6016 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9395
Fax: (206) 782-9569

©Copyright/Brokers
Association 2011
ALL RIGHTS RESERVED

CBA

CM Form PS-1A
Purchase & Sale Agreement
Rev. 1/2011
Page 2 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

solely responsible for obtaining any required consents to such assumption and the payment of any assumption fees. Seller shall cooperate with Buyer's efforts to receive any such consents but shall not be required to incur any out-of-pocket expenses or liability in doing so. Seller shall transfer the Vendor Contracts as provided in Section 17. SELLER SHALL DELIVER TO BUYER ALL ENVIRONMENTAL REPORTS, TESTING RESULTS, HAZARDOUS MATERIALS VIOLATIONS OR CLAIMS, AND INFORMATION REGARDING ANY DISCHARGE OR RELEASE OF HAZARDOUS MATERIALS THAT SELLER MAY POSSESS (BUT SELLER SHALL NOT HAVE ANY OBLIGATION TO ORDER OR PAY FOR ANY TESTING OR REPORTING). BUYER, AT BUYER'S EXPENSE, MAY CONTACT THE PERSON OR ENTITY PROVIDING SAID ENVIRONMENTAL REPORTS OR THE RESULTS AS PART OF BUYER'S FEASIBILITY CONTINGENCY.

b. **Access.** Seller shall permit Buyer and its agents, at Buyer's sole expense and risk to enter the Property at reasonable times subject to the rights of and after legal notice to tenants, to conduct inspections concerning the Property and improvements, including without limitation, the structural condition of improvements, hazardous materials, pest infestation, soils conditions, sensitive areas, wetlands, or other matters affecting the feasibility of the Property for Buyer's intended use. Buyer shall schedule any entry onto the Property with Seller in advance and shall comply with Seller's reasonable requirements including those relating to security, confidentiality, and disruption of Seller's tenants. Buyer shall not MAY perform any invasive testing including environmental inspections INCLUDING A PHASE II STUDY beyond a phase I assessment or contact the tenants or property management personnel without obtaining the Seller's prior written consent which shall not be unreasonably withheld. Buyer shall restore the Property and improvements to the same condition they were in prior to inspection. Buyer shall be solely responsible for all costs of its inspections and feasibility analysis and has no authority to bind the Property for purposes of statutory liens. Buyer agrees to indemnify and defend Seller from all liens, costs, claims, and expenses, including attorneys' and experts' fees, arising from or relating to entry onto or inspection of the Property by Buyer and its agents. This agreement to indemnify and defend Seller shall survive closing. Buyer may continue to enter the Property in accordance with the foregoing terms and conditions after removal or satisfaction of the feasibility contingency only for the purpose of leasing or to satisfy conditions of financing.

c. Buyer waives the right to receive a seller disclosure statement ("Form 17-Commercial") if required by RCW 64.06. However, if Seller would otherwise be required to provide Buyer with a Form 17-Commercial, and if the answer to any of the questions in the section of the Form 17-Commercial entitled "Environmental" would be "yes," then Buyer does not waive the receipt of the "Environmental" section of the Form 17-Commercial which shall be provided by Seller.

**G. TITLE INSURANCE.**

a. **Title Report.** Seller authorizes Buyer, its Lender, Listing Broker, Selling Broker or Closing Agent, at Seller's expense, to apply for and deliver to Buyer a ☐ standard ☒ extended (standard, if not completed) coverage owner's policy of title insurance. If an extended coverage owner's policy is specified, Buyer shall pay the increased costs associated with that policy including the excess premium over that charged for a standard coverage policy, and the cost of any survey required by the title insurer. The title report shall be issued by First American Title Insurance Company (a title company of Seller's choice, if not completed). If Seller previously received a preliminary commitment from a title insurer that Buyer declines to use, Buyer shall pay any cancellation fee owing to the original title insurer. Otherwise, the party applying for title insurance shall pay any title cancellation fee, in the event such a fee is assessed.

b. **Permitted Exceptions.** Buyer shall notify Seller of any objectionable matters in the title report or any supplemental report within the earlier of (1) twenty (20) days after Mutual Acceptance of this Agreement; or (2) the expiration of the Feasibility Period. This Agreement shall terminate and Buyer shall receive a refund of the earnest money, less any costs advanced or committed for Buyer, unless within five (5) days of Buyer's notice of such objections (1) Seller agrees, in writing, to remove all objectionable provisions or (2) Buyer notifies Seller that

INITIALS: Buyer _____ Date 7/2/13   Seller _____ Date 7/2/2013
         Buyer _____ Date _____   Seller _____ Date 7/2/13

The Lawless Partnership
6018 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9635
Fax: (206) 782-9569

© Commercial Brokers
Association © 2011
ALL RIGHTS RESERVED
CBA Form PS 1A
Purchase & Sale Agreement
Rev. 1/2011
Page 4 of 13

CBA

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

Buyer waives any objections which Seller does not agree to remove, if any new title matters are disclosed in a supplemental title report, then the preceding termination, objection and waiver provisions shall apply to the new title matters except that Buyer's notice of objections must be delivered within five (5) days of delivery of the supplemental report and Seller's response or Buyer's waiver must be delivered within two (2) days of Buyer's notice of objections. The closing date shall be extended to the extent necessary to permit time for these notices. Buyer shall not be required to object to any mortgage or deed of trust liens, or the statutory lien for real property taxes, and the same shall not be deemed to be Permitted Exceptions; provided, however, that the lien securing any financing which Buyer has agreed to assume shall be a Permitted Exception. Except for the foregoing, those provisions not objected to or, for which Buyer waived its objections shall be referred to collectively as the "Permitted Exceptions." Seller shall cooperate with Buyer and the title company to clear objectionable title matters but shall not be required to incur any out-of-pocket expenses or liability other than payment of monetary encumbrances not assumed by Buyer and proration of real property taxes, and Seller shall provide an owner's affidavit containing the information and reasonable covenants requested by the title company. The title policy shall contain no exceptions other than the General Exclusions and Exceptions common to such form of policy and the Permitted Exceptions.

7. CLOSING OF SALE. The sale shall be closed on (see addendum) within thirty (30) days of Buyer's satisfaction or waiver of the Feasibility Contingency, ("Closing") by First American Title Insurance Company ("Closing Agent") (Seller shall select the Closing Agent, if not completed). Buyer and Seller shall deposit with Closing Agent by 12:00 p.m. on the scheduled Closing date all instruments and monies required to complete the purchase in accordance with this Agreement. "Closing" shall be deemed to have occurred when the deed is recorded and the sale proceeds are available to Seller. Time is of the essence in the performance of this Agreement. Sale proceeds shall be considered available to Seller, even though they cannot be disbursed to Seller until the next business day after Closing. Notwithstanding the foregoing, if Seller informed Buyer during the Feasibility Period that Seller's underlying financing requires that it be defeased and may not be prepaid or, then Closing shall be conducted in accordance with the three-day closing process described in CBA Form PS_D. This Agreement is intended to constitute escrow instructions to Closing Agent. Buyer and Seller will provide any supplemental instructions requested by Closing Agent provided the same are consistent with this Agreement.

8. CLOSING COSTS AND PRORATIONS. Seller shall deliver an updated rent roll to Closing Agent not later than two (2) days before the scheduled Closing date in the form required by Section 5(a) and any other information reasonably requested by Closing Agent to allow Closing Agent to prepare a settlement statement for Closing. Seller certifies that the information contained in the rent roll is correct as of the date submitted. Seller shall pay the premium for the owner's standard coverage title policy. Buyer shall pay the excess premium attributable to any extended coverage or endorsements requested by Buyer, and the cost of any survey required in connection with the same. Seller and Buyer shall each pay one-half of the escrow fees. Any real estate excise taxes shall be paid by the party who bears primary responsibility for payment under the applicable statute or code. Real and personal property taxes and assessments payable in the year of closing; collected rents on any existing tenancies; interest; utilities; and other operating expenses shall be pro-rated as of Closing. If tenants pay any of the foregoing expenses directly, then Closing Agent shall only pro rate those expenses paid by Seller. Buyer shall pay to Seller at Closing an additional sum equal to any utility deposits or mortgage reserves for assumed financing for which Buyer receives the benefit after Closing. Buyer shall pay all costs of financing including the premium for the lender's title policy. If the Property was taxed under a deferred classification prior to Closing, then Seller shall pay all taxes, interest, penalties, deferred taxes or similar items which result from removal of the Property from the deferred classification. At Closing, all refundable deposits on tenancies shall be credited to Buyer or delivered to Buyer for deposit in a trust account if required by state or local law. Buyer shall pay any sales or use tax applicable to the transfer of personal property included in the sale.

INITIALS: Buyer _____ Date 7/18/13  Seller _____ Date 7/24/2013

Buyer _____ Date _____  Seller _____ Date 7/24/13

The Lawless Partnership
6018 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9535
Fax: (206) 782-9569

© Commercial Brokers
Association 2011
ALL RIGHTS RESERVED

CBA Form PS-1A
Purchase & Sale Agreement
Rev. 1/2011
Page 5 of 13

CBA

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

8. **Unpaid Utility Charges.** Buyer and Seller ☐ WAIVE · ☒ DO NOT WAIVE (do not waive if neither box checked) the right to have the Closing Agent disburse closing funds necessary to satisfy unpaid utility charges affecting the Property pursuant to RCW 60.80. If "do not waive" is checked, then attach CBA Form UA ("Utility Charges" Addendum) to this Agreement.

9. **POST-CLOSING ADJUSTMENTS, COLLECTIONS, AND PAYMENTS.** After Closing, Buyer and Seller shall reconcile the actual amount of revenues or liabilities upon receipt or payment thereof to the extent those items were prorated or credited at Closing based upon estimates. Any bills or invoices received by Buyer after Closing which relate to services rendered or goods delivered to the Seller or the Property prior to Closing shall be paid by Seller upon presentation of such bill or invoice. At Buyer's option, Buyer may pay such bill or invoice and be reimbursed the amount paid plus interest at the rate of 12% per annum beginning fifteen (15) days from the date of Buyer's written demand to Seller for reimbursement until such reimbursement is made. Notwithstanding the foregoing, if tenants pay certain expenses based on estimates subject to a post-closing reconciliation to the actual amount of those expenses, then Buyer shall be entitled to any surplus and shall be liable for any credit resulting from the reconciliation. Rents collected from each tenant after Closing shall be applied first to rentals due most recently from such tenant for the period after closing, and the balance shall be applied for the benefit of Seller for delinquent rentals owed for a period prior to closing. The amounts applied for the benefit of Seller shall be turned over by Buyer to Seller promptly after receipt. Seller shall be entitled to pursue any lawful methods of collection of delinquent rents but shall have no right to evict tenants after Closing.

10. **OPERATIONS PRIOR TO CLOSING.** Prior to Closing, Seller shall continue to operate the Property in the ordinary course of its business and maintain the Property in the same or better condition than as existing on the date of Mutual Acceptance but shall not be required to repair material damage from casualty except as otherwise provided in this Agreement. After the Feasibility Period, Seller shall not enter into or modify existing rental agreements or leases (except that Seller may enter into, modify, extend, renew or terminate residential rental agreements or residential leases in the ordinary course of its business), service contracts, or other agreements affecting the Property which have terms extending beyond Closing without first obtaining Buyer's consent, which shall not be unreasonably withheld.

11. **POSSESSION.** Buyer shall be entitled to possession ☒ on closing ☐ _____ (on closing, if not completed), Buyer shall accept possession subject to all tenancies disclosed to Buyer during the Feasibility Period.

12. **SELLER'S REPRESENTATIONS.** Except as disclosed to or known by Buyer prior to the satisfaction or waiver of the feasibility contingency stated in Section 5 above, including in the books, records and documents made available to Buyer, or in the title report or any supplemental report or documents referenced therein, Seller represents to Buyer that, to the best of Seller's actual knowledge, each of the following is true as of the date hereof: (a) Seller is authorized to enter into the Agreement, to sell the Property, and to perform its obligations under the Agreement; (b) the books, records, leases, agreements and other items delivered to Buyer pursuant to this Agreement comprise all material documents in Seller's possession or control regarding the operation and condition of the Property; (c) Seller has not received any written notice that the Property or the business conducted thereon violate any applicable laws, regulations, codes and ordinances; (d) Seller has all certificates of occupancy, permits, and other governmental consents necessary to own and operate the Property for its current use; (e) There is no pending or threatened litigation which would adversely affect the Property or Buyer's ownership thereof after Closing; (f) There is no pending or threatened condemnation or similar proceedings affecting the Property, and the Property is not within the boundaries of any planned or authorized local improvement district; (g) Seller has paid (except to the extent prorated at Closing) all local, state and federal taxes (other than real and personal property taxes and assessments described in Section 8 above) attributable to the period prior to closing which, if not paid, could constitute a lien on Property (including any personal property); or for which Buyer may be held liable after Closing; (h) Seller is not aware of any concealed material defects in the Property except as disclosed to Buyer in writing during the Feasibility Period; (i) There are no Hazardous

INITIALS: Buyer _____ Date 7/2/13   Seller _____ Date 7/2/13

Buyer _____ Date _____   Seller _____ Date 7/2/13

The Lawless Partnership
8018 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9535
Fax: (206) 782-9569

© Commercial Brokers
Association 2011
ALL RIGHTS RESERVED

CBA Form PS-1A
Purchase & Sale Agreement
Rev. 1/2011
Page 6 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

Substances (as defined below) currently located in, on, or under the Property in a manner or quantity that presently violates any Environmental Law (as defined below); there are no underground storage tanks located on the Property and there is no pending or threatened investigation or remedial action by any governmental agency regarding the release of Hazardous Substances or the violation of Environmental Law at the Property. As used herein, the term "Hazardous Substances" shall mean any substance or material now or hereafter defined or regulated as a hazardous substance, hazardous waste, toxic substance, pollutant, or contaminant under any federal, state, or local law, regulation, or ordinance governing any substance that could cause actual or suspected harm to human health or the environment ("Environmental Law"). The term "Hazardous Substances" specifically includes, but is not limited to, petroleum, petroleum by-products, and asbestos.

If prior to Closing Seller or Buyer discovers any information which would cause any of the representations above to be false if the same were deemed made as of the date of such discovery, then the party discovering the same shall promptly notify the other party in writing. If the newly-discovered information will result in costs or liability to Buyer in excess of the lesser of $100,000 or five percent (5%) of the purchase price stated in this Agreement, or will materially adversely affect Buyer's intended use of the Property, then Buyer shall have the right to terminate the Agreement and receive a refund of its earnest money. Buyer shall give notice of termination within five (5) days of discovering or receiving written notice of the new information. Nothing in this paragraph shall prevent Buyer from pursuing its remedies against Seller if Seller had actual knowledge of the newly-discovered information such that a representation provided for above was false.

13. **AS-IS.** Except for those representations and warranties specifically included in this Agreement: (i) Seller makes no representations or warranties regarding the Property; (ii) Seller hereby disclaims, and Buyer hereby waives, any and all representations or warranties of any kind, express or implied, concerning the Property or any portion thereof, as to its condition, value, compliance with laws, status of permits or approvals, existence or absence of hazardous material on site, occupancy rate or any other matter of similar or dissimilar nature relating in any way to the Property, including the warranties of fitness for a particular purpose, tenantability, habitability and use; (iii) Buyer otherwise takes the Property "AS IS;" and (iv) Buyer represents and warrants to Seller that Buyer has sufficient experience and expertise such that it is reasonable for Buyer to rely on its own pre-closing inspections and investigations.

14. **PERSONAL PROPERTY.**

a. This sale includes all right, title and interest of Seller to the following tangible personal property: ☐ None ☒ That portion of the personal property located on and used in connection with the Property which Seller will itemize in an Exhibit to be attached to this Agreement within ten (10) days of Mutual Acceptance (None, if not completed). The value assigned to the personal property shall be $_____ (if not completed, the County assessed value if available, and if not available, the fair market value determined by an appraiser selected by the Listing Broker and Selling Broker). Seller warrants title to, but not the condition of, the personal property and shall convey it by bill of sale.

b. In addition to the leases and Vendor Contracts assumed by Buyer pursuant to Section 6(a) above, this sale includes all right, title and interest of Seller to the following intangible property now or hereafter existing with respect to the Property including without limitation all rights-of-way, rights of ingress or egress or other interests in, on, or to any land, highway, street, road, or avenue, open or proposed, in, on, or across, in front of, abutting or adjoining the Property; all rights to utilities serving the Property; all drawings, plans, specifications and other architectural or engineering work product; all governmental permits, certificates, licenses, authorizations and approvals; all rights, claims, causes of action, and warranties under contracts with contractors, engineers, architects, consultants or other parties associated with the Property; all utility, security and other deposits and reserve accounts made as security for the fulfillment of any of Seller's obligations; any name of or telephone numbers for the Property and related trademarks, service marks or trade dress; and guaranties, warranties or other assurances of performance received.

INITIALS: Buyer _____ Date 1/1/13  Seller _____ Date 1/2/13

Buyer _____ Date _____  Seller _____ Date 1/3/13

The Lawless Partnership
6018 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9535
Fax: (206) 782-8569

© Commercial Brokers
Association 2011
ALL RIGHTS RESERVED

CBA

CBA Form PS-1A
Purchase & Sale Agreement
Rev. 10/2011
Page 7 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

15. **CONDEMNATION AND CASUALTY.** Seller bears all risk of loss until Closing, and thereafter Buyer shall bear the risk of loss. Buyer may terminate this Agreement and obtain a refund of the earnest money if improvements on the Property are destroyed or materially damaged by casualty before Closing, or if condemnation proceedings are commenced against all or a portion of the Property before Closing. Damage will be considered material if the cost of repair exceeds the lesser of $100,000 or five percent (5%) of the purchase price stated in this Agreement. Alternatively, Buyer may elect to proceed with closing, in which case, at Closing, Seller shall assign to Buyer all claims and right to proceeds under any property insurance policy and shall credit to Buyer at Closing the amount of any deductible provided for in the policy.

16. **FIRPTA - TAX WITHHOLDING AT CLOSING.** Closing Agent is instructed to prepare a certification (CBA or NWMLS Form 22E, or equivalent) that Seller is not a "foreign person" within the meaning of the Foreign Investment in Real Property Tax Act, and Seller shall sign it on or before Closing. If Seller is a foreign person, and this transaction is not otherwise exempt from FIRPTA, Closing Agent is instructed to withhold and pay the required amount to the Internal Revenue Service.

17. **CONVEYANCE.** Title shall be conveyed by a Statutory Warranty Deed subject only to the Permitted Exceptions. If this Agreement is for conveyance of Seller's vendee's interest in a Real Estate Contract, the Statutory Warranty Deed shall include a contract vendee's assignment sufficient to convey after acquired title. At Closing, Seller and Buyer shall execute and deliver to Closing Agent CBA Form No. PS-AS Assignment and Assumption Agreement transferring all leases and Vendor Contracts assumed by Buyer pursuant to Section 5(a) and all intangible property transferred pursuant to Section 14(b).

18. **NOTICES AND COMPUTATION OF TIME.** Unless otherwise specified, any notice required or permitted in, or related to, this Agreement (including revocations of offers and counteroffers) must be in writing. Notices to Seller must be signed by at least one Buyer and must be delivered to Seller and Listing Broker with a courtesy copy to any other party identified as a recipient of notices in Section 28. A notice to Seller shall be deemed delivered only when received by Seller, Listing Broker, or the licensed office of Listing Broker. Notices to Buyer must be signed by at least one Seller and must be delivered to Buyer, with a copy to Selling Broker and with a courtesy copy to any other party identified as a recipient of notices in Section 28. A notice to Buyer shall be deemed delivered only when received by Buyer, Selling Broker or the licensed office of Selling Broker. Selling Broker and Listing Broker have no responsibility to advise of receipt of a notice beyond either phoning the represented party or causing a copy of the notice to be delivered to the party's address provided in this Agreement. Buyer and Seller should keep Selling Broker and Listing Broker advised of their whereabouts in order to receive prompt notification of receipt of a notice. If any party is not represented by a licensee, then notices must be delivered to and shall be effective when received by that party at the address, fax number, or email indicated in Section 28.

Unless otherwise specified in this Agreement, any period of time in this Agreement shall mean Pacific Time and shall begin the day after the event starting the period and shall expire at 5:00 p.m. of the last calendar day of the specified period of time, unless the last day is a Saturday, Sunday or legal holiday as defined in RCW 1.16.050, in which case the specified period of time shall expire on the next day that is not a Saturday, Sunday or legal holiday. Any specified period of five (5) days or less shall not include Saturdays, Sundays or legal holidays. Notwithstanding the foregoing, references to specific dates or times or number of hours shall mean those dates, times or number of hours provided, however, that if the Closing Date falls on a Saturday, Sunday, or legal holiday as defined in RCW 1.16.050, or a date when the county recording office is closed, then the Closing Date shall be the next regular business day.

19. **AGENCY DISCLOSURE.** At the signing of this Agreement,

Selling Broker NA

represented

INITIALS:   Buyer _____   Date 7/12/13   Seller _____   Date 7/12/13
            Buyer _____   Date _____   Seller _____   Date 7/12/13

The Lawless Partnership
6018 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9585
Fax: (206) 782-9569

© Commercial Brokers
Association 2001
ALL RIGHTS RESERVED

CBA Form PS-1A
Purchase & Sale Agreement
Rev. 10/01)
Page 8 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

and the Listing Broker NA

represented _____

Selling Firm, Selling Firm's Designated Broker, Selling Broker's Branch Manager (if any) and Selling Broker's Managing Broker (if any) represent the same party that Selling Broker represents. Listing Firm, Listing Firm's Designated Broker, Listing Broker's Branch Manager (if any), and Listing Broker's Managing Broker (if any) represent the same party that the Listing Broker represents. If Selling Broker and Listing Broker are different persons affiliated with the same Firm, then both Buyer and Seller confirm their consent to the Brokers' Designated Broker, Branch Manager (if any), and Managing Broker (if any) representing both parties as a dual agent. If Selling Broker and Listing Broker are the same person representing both parties, then both Buyer and Seller confirm their consent to that person and his/her Designated Broker, Branch Manager (if any), and Managing Broker (if any) representing both parties as dual agents. All parties acknowledge receipt of the pamphlet entitled "The Law of Real Estate Agency."

20. **ASSIGNMENT.** Buyer ☒ may ☒ may not (may not, if not completed) assign this Agreement, or Buyer's rights hereunder, without Seller's prior written consent, unless provided otherwise herein. If the "may not" option is selected and the words "and/or assigns" or similar words are used to identify the Buyer, then this Agreement may be assigned with notice to Seller but without Seller's consent only to an entity which is controlled by or under common control with the Buyer identified in this Agreement. Any other assignment requires Seller's consent. The party identified as the Initial Buyer shall remain responsible for those obligations of Buyer stated in this Agreement notwithstanding any assignment and, if this Agreement provides for Seller to finance a portion of the purchase price, then the party identified as the Initial Buyer shall guarantee payment of the Seller financing. NOTWITHSTANDING THE FOREGOING, BUYER MAY ASSIGN THIS PURCHASE AND SALE AGREEMENT TO AN ENTITY SUBSTANTIALLY CONTROLLED BY SARA CARTER AND WADE CARTER.

21. **DEFAULT AND ATTORNEY'S FEE.**

a. **Buyer's default.** In the event Buyer fails, without legal excuse, to complete the purchase of the Property, then (check one):

☒ Seller may terminate this Agreement and keep the earnest money as liquidated damages as the sole and exclusive remedy available to Seller for such failure; or

☐ Seller may, at its option: (a) terminate this Agreement and keep as liquidated damages the earnest money as the sole and exclusive remedy available to Seller for such failure, (b) bring suit against Buyer for Seller's actual damages, (c) bring suit to specifically enforce this Agreement and recover any incidental damages, or (d) pursue any other rights or remedies available at law or equity.

b. **Seller's default.** In the event Seller fails, without legal excuse, to complete the sale of the Property, then (check one):

☒ As Buyer's sole remedy, Buyer may either (a) terminate this Agreement and recover all earnest money or fees paid by Buyer, whether or not the same are identified as refundable or applicable to the purchase price, or (b) bring suit to specifically enforce this Agreement and recover incidental damages, provided, however, Buyer must file suit within sixty (60) days from the scheduled date of closing or from the date Seller has informed Buyer in writing that Seller will not proceed with closing, whichever is earlier; or

☐ Buyer may, at its option, (a) bring suit against Seller for Buyer's actual damages, (b) bring suit to specifically enforce this Agreement and recover any incidental damages, or (c) pursue any other rights or remedies available at law or equity.

Neither Buyer nor Seller may recover consequential damages such as lost profits. If Buyer or Seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonable attorneys' fees and expenses. In the event of trial, the amount of the attorney's fee shall be fixed by the court. The venue of any suit

INITIALS: Buyer _____ Date 7/11/13  Seller _____ Date 7/12/13
Buyer _____ Date _____  Seller _____ Date 7/12/13

The Lawless Partnership
6010 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9595
Fax: (206) 782-9569

© Commercial Brokers
Association 2011
ALL RIGHTS RESERVED

CBA Form PS-1A
Purchase & Sale Agreement
Rev. 1/2011
Page 9 of 13

CBA

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

shall be the county in which the Property is located, and this Agreement shall be governed by the laws of the state where the Property is located.

**22. MISCELLANEOUS PROVISIONS:**

a. **Complete Agreement.** This Agreement and any addenda and exhibits thereto state the entire understanding of Buyer and Seller regarding the sale of the Property. There are no verbal or other written agreements which modify or affect the Agreement.

b. **Counterpart Signatures.** This Agreement may be signed in counterpart, each signed counterpart shall be deemed an original, and all counterparts together shall constitute one and the same agreement.

c. **Electronic Delivery.** Electronic delivery of documents (e.g., transmission by facsimile or email) including signed offers or counteroffers and notices shall be legally sufficient to bind the party the same as delivery of an original. At the request of either party, or the Closing Agent, the parties will replace electronically delivered offers or counteroffers with original documents.

d. **Section 1031 Like-Kind Exchange.** If either Buyer or Seller intends for this transaction to be a part of a Section 1031 like-kind exchange, then the other party agrees to cooperate in the completion of the like-kind exchange so long as the cooperating party incurs no additional liability in doing so, and so long as any expenses (including attorneys fees and costs) incurred by the cooperating party that are related only to the exchange are paid or reimbursed to the cooperating party at or prior to Closing. Notwithstanding Section 20 above, any party completing a Section 1031 like-kind exchange may assign this Agreement to its qualified intermediary or any entity set up for the purposes of completing a reverse exchange.

**23. ACCEPTANCE; COUNTEROFFERS:** Seller has until midnight of May 17/June _____, 2013 (if not filled in, the third business day) following the day Buyer delivers the offer to accept this offer, unless sooner withdrawn. If this offer is not timely accepted, it shall lapse and the earnest money shall be refunded to Buyer. If either party makes a future counteroffer, the other party shall have until 5:00 p.m. on the _____ business day (if not filled in, the second business day) following receipt to accept the counteroffer, unless sooner withdrawn. If the counteroffer is not timely accepted or countered, this Agreement shall lapse and the earnest money shall be refunded to the Buyer. No acceptance, offer or counteroffer from the Buyer is effective until a signed copy is received by the Seller, the Listing Broker or the licensed office of the Listing Broker. No acceptance, offer or counteroffer from the Seller is effective until a signed copy is received by the Buyer, the Selling Broker or the licensed office of the Selling Broker. "Mutual Acceptance" shall occur when the last counteroffer is signed by the offeree, and the fully-signed counteroffer has been received by the offeror, his or her broker, or the licensed office of the broker. If any party is not represented by a broker, then notices must be delivered to and shall be effective when received by that party.

**24. INFORMATION TRANSFER:** In the event this Agreement is terminated, Buyer agrees to deliver to Seller within ten (10) days of Seller's written request copies of all materials received from Seller and any non-privileged plans, studies, reports, inspections, appraisals, surveys, drawings, permits, applications or other development work product relating to the Property in Buyer's possession or control as of the date this Agreement is terminated.

**25. CONFIDENTIALITY:** Until and unless closing this Loan consummated, Buyer and Seller shall follow reasonable measures to prevent unnecessary disclosure of information obtained in connection with the negotiation and performance of this Agreement. Neither party shall use or knowingly permit the use of any such information in any manner detrimental to the other party.

**26. SELLER'S ACCEPTANCE AND BROKERAGE AGREEMENT:** Seller agrees to sell the Property on the terms and conditions herein, and further agrees to pay a commission in a total amount computed in accordance with the listing or commission agreement. If there is no written listing or commission agreement, Seller agrees to pay a commission of _____% of the sales price or $_____. The commission shall be apportioned between Listing Firm

INITIALS: Buyer _____ Date 7/12/13  Seller _____ Date _____
Buyer _____ Date _____  Seller _____ Date 7/12/13

The Lawless Partnership
6015 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9535
Fax: (206) 782-9568

© Commercial Brokers
Association 2011
ALL RIGHTS RESERVED
CBA Form PS-1A
Purchase & Sale Agreement
Rev. 3/2011
Page 10 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
## (CONTINUED)

and Selling Firm as specified in the listing or any co-brokerage agreement. If there is no listing or written co-brokerage agreement, then Listing Firm shall pay to Selling Firm a commission of _____% of the sales price or $_____. Seller assigns to Listing Firm and Selling Firm a portion of the sales proceeds equal to the commission. If the earnest money is retained as liquidated damages, any costs advanced or committed by Listing Firm or Selling Firm for Buyer or Seller shall be reimbursed or paid therefrom, and the balance shall be paid one-half to Seller and one-half to Listing Firm and Selling Firm according to the listing agreement and any co-brokerage agreement. In any action by Listing Firm or Selling Firm to enforce this Section, the prevailing party is entitled to reasonable attorneys' fees and expenses. Neither Listing Firm nor Selling Firm are receiving compensation from more than one party to this transaction unless disclosed on an attached addendum. In which case Buyer and Seller consent to such compensation. The Property described in attached Exhibit A is commercial real estate. Notwithstanding Section 25 above, the pages containing this Section, the parties' signatures and an attachment describing the Property may be recorded.

27. **LISTING BROKER AND SELLING BROKER DISCLOSURE:** Seller and Buyer each represent to the other that it has not engaged a broker in connection with the sale of the Property from Seller to Buyer. Each party agrees to indemnify and hold the other harmless from any sales commission or claim therefor thereafter made against the other on account of any broker which that party has engaged or dealt with in connection with the Property or this Agreement. EXCEPT AS OTHERWISE DISCLOSED IN WRITING TO BUYER OR SELLER, THE SELLING BROKER, LISTING BROKER AND FIRMS HAVE NOT MADE ANY REPRESENTATIONS OR WARRANTIES OR CONDUCTED ANY INDEPENDENT INVESTIGATION CONCERNING THE LEGAL EFFECT OF THIS AGREEMENT, BUYER'S OR SELLER'S FINANCIAL STRENGTH, BOOKS, RECORDS, REPORTS, STUDIES, OR OPERATING STATEMENTS, THE CONDITION OF THE PROPERTY OR ITS IMPROVEMENTS, THE FITNESS OF THE PROPERTY FOR BUYER'S INTENDED USE OR OTHER MATTERS RELATING TO THE PROPERTY, INCLUDING WITHOUT LIMITATION, THE PROPERTY'S ZONING, BOUNDARIES, AREA, COMPLIANCE WITH APPLICABLE LAWS (INCLUDING LAWS REGARDING ACCESSIBILITY FOR DISABLED PERSONS), OR HAZARDOUS OR TOXIC MATERIALS INCLUDING MOLD OR OTHER ALLERGENS. SELLER AND BUYER ARE EACH ADVISED TO ENGAGE QUALIFIED EXPERTS TO ASSIST WITH THESE DUE DILIGENCE AND FEASIBILITY MATTERS, AND ARE FURTHER ADVISED TO SEEK INDEPENDENT LEGAL AND TAX ADVICE RELATED TO THIS AGREEMENT.

INITIALS: Buyer _____ Date 7/12/13   Seller _____ Date 7/12/13
Buyer _____ Date _____   Seller _____ Date 7/12/13

The Lawless Partnership
6016 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9535
Fax: (206) 782-9569

© Commercial Brokers
Association 2011
ALL RIGHTS RESERVED

CBA Form PS-1A
Purchase & Sale Agreement
Rev. 1/2011
Page 11 of 13

## COMMERCIAL & INVESTMENT REAL ESTATE
## PURCHASE & SALE AGREEMENT
### (CONTINUED)

**28. IDENTIFICATION OF THE PARTIES.** The following is the contact information for the parties involved in this Agreement:

**Buyer**

Contact: _____
Address: _____
Business Phone: _____
Mobile Phone: _____
Fax: _____
Email: _____

**Seller**

Contact: _____ Harry Yourist _____
Address: _____ 935 N 175th, Shoreline, WA 99133 _____
Business Phone: _____ 206.546.1061 _____
Mobile Phone: _____ 425.275.1038 _____
Fax: _____
Email: _____ youristharry@comcast.net _____

*Formatted: Superscript*

**Selling Firm**

Name: _____
Assumed Name (if applicable): _____
Selling Broker: _____
Address: _____
Business Phone: _____
Mobile Phone: _____
Email: _____
Fax: _____
MLS Office No.: _____

**Listing Firm**

Name: _____
Assumed Name (if applicable): _____
Listing Broker: _____
Address: _____
Business Phone: _____
Mobile Phone: _____
Email: _____
Fax: _____
MLS Office No.: _____

**Licensed Office of the Selling Broker**

Address: _____
Business Phone: _____
Email: _____
Fax: _____
CBA Office No.: _____

**Licensed Office of the Listing Broker**

Address: _____
Business Phone: _____
Email: _____
Fax: _____
CBA Office No.: _____

INITIALS: Buyer _____ Date 7/12/13    Seller _____ Date 7/17/13
Buyer _____ Date _____    Seller _____ Date 7/17/13

The Lawless Partnership
6618 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9585
Fax: (206) 782-9569

© Commercial Brokers
Association 2001
ALL RIGHTS RESERVED
CBA Form PS-1A
Purchase & Sale Agreement
Rev. 1/2011
Page 12 of 13

CBA

**COMMERCIAL & INVESTMENT REAL ESTATE
PURCHASE & SALE AGREEMENT
(CONTINUED)**

Courtesy Copy of Notices to Buyer to:

Name: _____
Address: _____
Business Phone: _____
Fax: _____
Mobile Phone: _____
Email: _____

Courtesy Copy of Notices to Seller to:

Name: _____ Inger Brockman
Address: _____ Montgomery  Purdue  Blankinship  &
Austin PLLC
Business Phone: _____ 206.682.7090
Fax: _____ 206.625.9534
Mobile Phone: _____
Email: _____ brockman@mpba.com

IN WITNESS WHEREOF, the parties have signed this Agreement intending to be bound.

Buyer _____          Buyer _____
       Printed name and type of entity          Printed name and type of entity

Buyer _____ V.P.                Buyer _____
       Signature and title                      Signature and title

Date signed _____     Date signed _____

Seller _____          Seller _____
       Printed name and type of entity          Printed name and type of entity

Seller _____          Seller _____
       Signature and title                      Signature and title

Date signed __7/12/13__                  Date signed __7/12/13__


INITIALS:  Buyer _____  Date _7/12/13_  Seller _____  Date _7/12/13_
           Buyer _____  Date _____  Seller _____  Date _7/12/13_

The Lawless Partnership
6018 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9565
Fax: (206) 782-9569

© Commercial Brokers
Association 2011
ALL RIGHTS RESERVED

CBA Form PS-1A
Purchase & Sale Agreement
Rev. 1/2011
Page 13 of 13



**COMMERCIAL & INVESTMENT REAL ESTATE**
**PURCHASE & SALE AGREEMENT**
**(CONTINUED)**

**EXHIBIT A**

**[Legal Description]**

PARCEL A (23,985 SQ. FT.)
THAT PORTION OF THE NORTH 1/2 OF THE N.E. 1/4 OF THE S.E. 1/4 OF THE S.W.1/4 OF SEC. 7,
T. 26 N., R. 4 E., W.M., KING COUNTY, WA.
AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE N.E. CORNER OF THE S.W. 1/4 OF SAID SECTION 7;  THENCE S.00°16'23" W
ALONG THE EAST LINE OF SAID S.W. 1/4 FOR A DISTANCE OF 165.03 FT.;  THENCE N 89°02'54" W
66.01 FT. TO THE WESTERLY RIGHT-OF-WAY OF AURORA AVE N. AT CENTERLINE STATION
2416+00.00, 49.00 FT. LEFT AND THE POINT OF BEGINNING;  THENCE N 00°02'54" W 227.47 FT.;
THENCE N 00°16'04" E, 86.52 FT.;  THENCE S 89°02'52" W 70.91 FT;  THENCE N 89°21'20" E 58.32
FT.;  THENCE N 00°07'00" E, 33.88 FT. TO THE SOUTHERLY LIMITS OF N. 175TH ST.;  THENCE S 87°
19'39" E ALONG N. 175TH ST. 98.64 FT. TO AURORA AVE. N. CENTERLINE STA. 2421+16.32, 73.46 FT.
LEFT;  THENCE S 44°34'00" E, 39.39 FT. TO AURORA AVE. N. CENTERLINE STA. 2421+18.48, 49.00
FT. LEFT;  THENCE S 02°39'11" E ALONG AURORA AVE. N. 111.40 FT. TO THE POINT OF
BEGINNING.

PARCEL B (7,209 SQ. FT.)
THAT PORTION OF THE NORTH HALF OF THE N.E. 1/4 OF THE S.W. 1/4 OF SEC. 7, T. 26 N., R. 4
EAST, W.M., IN KING COUNTY, WA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE N.E. CORNER OF THE S.W. 1/4 OF SAID SECTION 7;  THENCE N 89°02'50" W
ALONG THE NORTH LINE OF THE S.E. 1/4 OF SAID SEC. 7, FOR A DISTANCE OF 204.29 FT.;  THENCE
S 00°07'00" W, 43.04 FT. TO THE SOUTHERLY LIMITS OF N. 175TH ST. AND THE POINT OF
BEGINNING;  THENCE S 87°47'32" E ALONG N. 175TH ST. 104.39 FT.;  THENCE S 00°07'00" W
33.68 FT.;  THENCE S 89°21'20" W, 58.32 FT.;  THENCE N 89°02'52" W 70.91 FT.;  THENCE N 00°
16'04" E, 70.97 FT. TO THE POINT OF BEGINNING.

To ensure accuracy in the legal description, consider substituting the legal description contained in the preliminary
commitment for title insurance or a copy of the Property's last vesting deed for this page.  Do not neglect to label
the substitution "Exhibit A."  You should avoid transcribing the legal description because any error in transcription
may render the legal description inaccurate and this Agreement unenforceable.

INITIALS:  Buyer _____ Date __11/1/13__  Seller _____ Date __2/12/13__

Buyer _____ Date _____  Seller _____ Date __2/12/13__

The Lawless Partnership
0018 Seaview Avenue NW
Seattle, WA 08107-
Phone: (206) 782-9535
Fax: (206) 782-9569

© Commercial Brokers
Association 2011
ALL RIGHTS
RESERVED
CBA Form PSA
Addendum/Amendment
to PSA
Rev. 1/2011
Page 1 of 3

## ADDENDUM/AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

CBA Text Disclaimer: Text deleted by Broker indicated by strike.
New text inserted by licensee indicated by small capitalization.

The following is part of the Purchase and Sale Agreement dated May/June ___, 2013 (the "Agreement") between

Carter & Carter, LLC ("Buyer") and Harry and Rosalie Yourist ("Seller") regarding the sale of the

property legally described therein and known as Lots A and B, SHLA-201854, at 17265 Aurora Ave N , Shoreline, WA

~~Lots A and B, 17255 Aurora Ave N , Shoreline, WA~~ (the "Property").

IT IS AGREED BETWEEN THE BUYER AND SELLER AS FOLLOWS:

1. Buyer and Seller's obligations under this Agreement are conditioned upon
approval of this Agreement by the US Bankruptcy Court. If Seller has not gotten
approval of the US Bankruptcy Court by October 30, 2013, then this Agreement
shall terminate and any earnest money shall be returned to Buyer.

2. Buyer and Seller's obligations under this Agreement are conditioned on Buyer's
purchase under that certain Commercial & Investment Purchase and Sale Agreement
April 1, 2011, as amended ("2011 PSA") of adjacent real property known as Lot C
of SHLA-201854 ("BLA Property"). If Buyer has not purchased the BLA Property in
accordance with the timeline set forth in the 2011 PSA, as amended then Seller
may terminate this Agreement upon written notice to Buyer.

3. At Closing, Buyer, as landlord, and Seller, as tenant, shall execute a lease for
that portion of the Property currently operated by Seller as a fuel
station/convenience store/car wash for purposes of Seller's continued operations
as a fuel station and convenience store under its current retail sales (fuel
distribution) agreement with Allied Fuel. The lease shall be a commercial NNN
lease on the following terms: (i-)

   a. Base Rent of not more than $1000/month

ALL OTHER TERMS AND CONDITIONS of the Agreement remain unchanged.

INITIALS: Buyer _____ Date 7/12/13   Seller _____ Date 7/12/13
         Buyer _____ Date _____   Seller _____ Date 7/14/

The Lawless Partnership
6018 Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-9335
Fax: (206) 782-9558

© Commercial Brokers
Association 2011
ALL RIGHTS
RESERVED

CBA Form PSA
Addendum/Amendment
to PSA
Rev. 1/2011
Page 2 of 3

## ADDENDUM/AMENDMENT TO
## PURCHASE AND SALE AGREEMENT
CBA Text Disclaimer: Text deleted by strike. New text inserted by Roman and indicated by small capital letters (INSERTA).

~~b. Term of 5 years with at least one  5 year option to extend~~

~~Buyer and Seller shall agree on the form of lease by October 30, 2013.~~

SUPPLEMENTAL CONDITIONS OF SALE

~~This offer is made on property currently within the jurisdiction of the US Bankruptcy Court.  It is also made in conjunction with an offer to acquire property pursuant to a boundary line adjustment described in City of Shoreline Boundary Adjustment number SMA-701154 (BLA Property).  It is anticipated that the BLA Property will close two weeks after bankruptcy Court approval.  With respect to Lots A and B (the property subject to this purchase and sale agreement) they will close after the satisfaction by the Buyer of the following contingencies.  Because the Buyer will not be investing the resources to conduct the necessary testing until approval by the bankruptcy Court, and because the extent of the testing necessary will not be known until the results of the initial environmental reports are received.  It is agreed that all of the following contingencies (except bankruptcy court approval) shall be in effect for 360 days after approval by the US Bankruptcy Court.  Provided that the Buyer has the right to waive or satisfy the contingencies listed below prior to that time, and that a purchase agreement shall close within 30 days if satisfaction or waiver of said contingencies in Buyer's sole discretion.  The contingencies are as follows:~~

~~1. Approval of the US Bankruptcy Court, allowing the property to be sold with clear title at the time of closing.  It shall be Seller's responsibility to obtain bankruptcy Court approval on or before October 30, 2013.~~

ALL OTHER TERMS AND CONDITIONS of the Agreement remain unchanged.

INITIALS: Buyer _____ Date 7/8/13   Seller _____ Date 7/12/13
         Buyer _____ Date _____    Seller _____ Date 7/12/13

Formatted: Tab stops: 0.5", Left
Formatted: Font: 10 pt, Underline, Font color: Auto
Formatted: Underline, Font color: Auto
Formatted: List Paragraph

The Lawless Partnership
801B Seaview Avenue NW
Seattle, WA 98107
Phone: (206) 782-0635
Fax: (206) 782-0869

© Commercial Brokers
Association 2011
ALL RIGHTS
RESERVED

CBA Form PSA
Addendum/Amendment
to PSA
Rev. 1/2011
Page 5 of 8

## ADDENDUM/AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

CBA Text Disclaimer: Text deleted by licensee indicated by strike.
New text inserted by licensee indicated by small capital letters.

2.    The ~~feasibility study set forth in the purchase and sale agreement.~~

3.    ~~Environmental Testing, including a Phase I study. Costs of any environmental testing
shall be paid by Buyer.~~

4.    ~~Obtain a satisfactory "lease-back" with Mr. and Ms. Yessick, whereby they will
operate the gasoline station after signing under a lease agreement with the Seller.~~
~~And approval of the Shell company and the gasoline distributor.~~

ALL OTHER TERMS AND CONDITIONS of the Agreement remain unchanged.

INITIALS:  Buyer _____  Date 7/1/13   Seller _____  Date 2/12/13
           Buyer _____  Date _____  Seller _____  Date 7/12/13

## EXHIBIT C

## APPROVED TITLE EXCEPTIONS
### CARTER and CARTER, LLC (Purchaser)
### HARRY and ROSALIE YOURIST (Sellers)

Reference is made to the 12th Preliminary Title Report from First American Title Company, a copy of which is attached hereto and incorporated herein by reference. With respect to said Title Report, Buyer identifies those Special Exceptions which are approved and those which are not approved. The numbering below corresponds to the numbering in the Title Report.

1. Accepted.

2 through 13. Intentionally deleted.

14. Accepted.

15. Not accepted and to be deleted at the time of closing. The title company has already been provided with a letter from the Ronald Sewer District confirming that the Temporary Construction Easement is no longer in effect.

16. Accepted.

17. Not acceptable and to be deleted.

18 and 19. Intentionally deleted.

20. Accepted.

21. Intentionally deleted.

22. Not acceptable and to be paid by Sellers and/or removed by the Bankruptcy Court.

23. To be deleted and therefore not accepted by Buyer.

24. Intentionally deleted.

25. Not acceptable to the Buyer, to be paid at the time of closing or eliminated through the Bankruptcy Court.

26. Not acceptable to the Buyer, to be paid at the time of closing or eliminated through the Bankruptcy Court.

27. Intentionally deleted.

28. Acceptable.

29 through 32. Intentionally deleted.

33. To be deleted.

34 through 47. Intentionally deleted.

48. Acceptable.

49 and 50. Intentionally deleted.

51. Those documents will be provided by Buyer prior to closing.

52 through 54. Intentionally deleted.

55. Unacceptable. To be paid by Sellers at time of closing and/or removed by the Bankruptcy Court.

56. Unacceptable. To be paid by Sellers at time of closing and/or removed by the Bankruptcy Court.

57 through 62. Intentionally deleted.

63. To be pro rated at the time of closing.

64. Intentionally deleted.



# COMMITMENT FOR TITLE INSURANCE

Issued by

## FIRST AMERICAN TITLE INSURANCE COMPANY

First American Title Insurance Company, herein called the Company, for valuable consideration, hereby commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the proposed Insured named in Schedule A, as owner or mortgagor of the estate or interest covered hereby in the land described or referred to in Schedule A, upon payment of the premiums and charges therefor; all subject to the provisions of Schedules A and B and to the Conditions and Stipulations hereof.

This Commitment shall be effective only when the identity of the proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A hereof by the Company, either at the time of the issuance of the Commitment or by subsequent endorsement.

This Commitment if preliminary to the issuance of such policy or policies of title insurance and all liability and obligations hereunder shall cease and terminate six (6) months after the effective date hereof or when the policy or policies committed for shall issue, whichever first occurs, provided that the failure to issue such policy or policies is not the fault of the Company. This Commitment shall not be valid or binding until countersigned by an authorized officer or agent.

IN WITNESS WHEREOF, the Company has caused this commitment to be signed and sealed, to become valid when countersigned by an authorized officer or agent of the Company, all in accordance with its By-Laws. This Commitment is effective as of the date shown in Schedule A as "Effective Date."

First American Title Insurance Company

By: _____ President

Attest: _____ Secretary

By: _____ Countersigned

FILENAME: Cover
VERSION: Last

*First American Title Insurance Company*



## First American Title Insurance Company
### National Commercial Services
818 Stewart Street, Suite 800, Seattle, WA 98101
(206)728-0400 ~ (800)526-7544  FAX (206)448-6348

Mike Cooper
(206)615-3107
mcooper@firstam.com

Victoria L. Coats
(206)615-3126
vcoats@firstam.com

To:   Key Bank
      4503 155th Ave SE
      Bellevue, WA 98006

File No.: NCS-464753-WA1
Your Ref No.: Carter/Yourist

Attn:  Benton Smith

### TWELFTH REPORT
### SCHEDULE A

1.   Commitment Date: February 25, 2013 at 7:30 A.M.

2.   Policy or Policies to be issued:

|  | AMOUNT | PREMIUM | TAX |
|---|---|---|---|
| Standard Owner's Coverage | $ 787,176.00 $ | To Follow $ | To Follow |
| Proposed Insured: Carter & Carter, LLC, a Washington limited liability company | | | |
| Extended Mortgagee's Coverage | $ 800,000.00 $ | To Follow $ | To Follow |
| Proposed Insured: Key Bank | | | |

3.   The estate or interest in the land described on Page 2 herein is **Fee Simple**, and title thereto is at the effective date hereof vested in:

     Harry Yourist and Rosalie Yourist, husband and wife

4.   The land referred to in this Commitment is described as follows:

     The land referred to in this report is described in Exhibit "A" attached hereto.

*First American Title Insurance Company*

## EXHIBIT 'A'

LEGAL DESCRIPTION:

THAT PORTION OF THE NORTH HALF OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 7, TOWNSHIP 26 NORTH, RANGE 4 EAST, W.M., IN KING COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF THE SOUTHWEST QUARTER OF SAID SECTION 7;
THENCE NORTH 89°02'52" WEST ALONG THE NORTH LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 7 FOR A DISTANCE OF 294.29 FEET;
THENCE SOUTH 00°16'04" WEST 43.04 FEET TO THE SOUTHERLY LIMITS OF NORTH 175TH STREET AND THE POINT OF BEGINNING;
THENCE SOUTH 00°16'04" WEST 143.50 FEET;
THENCE NORTH 89°02'54" WEST 104.92 FEET;
THENCE NORTH 00°16'04" EAST 144.53 FEET TO THE SOUTHERLY LIMITS OF NORTH 175TH STREET;
THENCE SOUTH 89°02'52" EAST ALONG NORTH 175TH STREET FOR A DISTANCE OF 57.76 FEET;
THENCE CONTINUING ALONG THE SOUTHERLY LIMITS OF NORTH 175TH STREET FOR A DISTANCE OF 47.18 FEET TO THE POINT OF BEGINNING.

(ALSO KNOWN AS A PORTION OF PARCEL C OF CITY OF SHORELINE BOUNDARY ADJUSTMENT NO. SHLA-201854 RECORDED APRIL 21, 2011 UNDER RECORDING NO. 20110421900001).

## SCHEDULE B - SECTION 1
### REQUIREMENTS

The following are the Requirements to be complied with:

Item (A)   Payment to or for the account of the Grantors or Mortgagors of the full consideration for the estate or interest to be insured.

Item (B)   Proper instrument(s) creating the estate or interest to be insured must be executed and duly filed for record.

Item (C)   Pay us the premiums, fees and charges for the policy.

Item (D)   You must tell us in writing the name of anyone not referred to in this Commitment who will get an interest in the land or who will make a loan on the land. We may then make additional requirements or exceptions

## SCHEDULE B - SECTION 2
### GENERAL EXCEPTIONS

The Policy or Policies to be issued will contain Exceptions to the following unless the same are disposed of to the satisfaction of the Company.

A.   Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

B.   Any facts, rights, interest, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of person in possession thereof.

C.   Easements, claims of easement or encumbrances which are not shown by the public records.

D.   Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.

E.   (1) Unpatented mining claims; (2) reservations or exceptions in patents or in acts authorizing the issuance thereof; (3) Water rights, claims or title to water, whether or not the matters excepted under (1), (2) or (3) are shown by the public records; (4) Indian Tribal Codes or Regulations, Indian Treaty or Aboriginal Rights, including easements or equitable servitudes.

F.   Any lien, or right to a lien, for services, labor, materials or medical assistance theretofore or hereafter furnished, imposed by law and not shown by the public records.

G.   Any service, installation, connection, maintenance, construction, tap or reimbursement charges/costs for sewer, water, garbage or electricity.

H.   Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires of record for value the estate or interest or mortgages thereon covered by this Commitment.

*First American Title Insurance Company*

## SCHEDULE B – SECTION 2
### (continued)
### SPECIAL EXCEPTIONS

1. Lien of the Real Estate Excise Sales Tax and Surcharge upon any sale of said premises, if unpaid. As of the date herein, the excise tax rate for the **City of Shoreline** is at **1.78%**. Levy/Area Code: 2263

   For all transactions recorded on or after July 1, 2005:
   - A fee of $10.00 will be charged on all exempt transactions;
   - A fee of $5.00 will be charged on all taxable transactions in addition to the excise tax due.

2. This item has been intentionally deleted.

3. This item has been intentionally deleted.

4. This item has been intentionally deleted.

5. This item has been intentionally deleted.

6. This item has been intentionally deleted.

7. This item has been intentionally deleted.

8. This item has been intentionally deleted.

9. This item has been intentionally deleted.

10. This item has been intentionally deleted.

11. This item has been intentionally deleted.

12. This item has been intentionally deleted.

13. This item has been intentionally deleted.

14. Right to make necessary slopes for cuts or fills upon said premises for road as granted by deed recorded December 9, 1938 under Recording No. 3023380.

15. Easement, including terms and provisions contained therein:

    | | |
    |---|---|
    | Recording Information: | April 12, 1962 under Recording No. 5411716 |
    | In Favor of: | Ronald Sewer District, a municipal corporation |
    | For: | Sewers |
    | Affects: | as described therein |

16. Right to make necessary slopes for cuts or fills upon said premises for road as granted by deed recorded February 13, 1973 under Recording No. 7302130517.

*First American Title Insurance Company*

17. Lease made by Manitou Investment Company, a Washington corporation, lessor, to Shell Oil Company, a Delaware corporation, lessee, for a term of undisclosed, and the covenants and conditions as therein contained, as disclosed by Memorandum of Lease dated May 5, 1972, and recorded May 29, 1973 as document no. 7305290167.

Document(s) declaring modifications thereof recorded May 30, 1973 and September 18, 1975 as Recording Nos. 7305300186 and 7509180186 of Official Records.

Pursuant to letter dated August 11, 1997, Texaco Refining and Marketing Inc. (Current lessee) will not exercise its right of first refusal to purchase the property, based upon the offer to purchase by Harry R. Yourist and Rosalie H. Yourist.

Affects:             The land and other property.

18. This item has been intentionally deleted.

19. This item has been intentionally deleted.

20. Right to make necessary slopes for cuts or fills upon said premises for road as granted by deed recorded October 3, 1975 under Recording No. 7510030507.

21. This item has been intentionally deleted.

22. Deed of Trust and the terms and conditions thereof.
| | |
|---|---|
| Grantor/Trustor: | Harry R. Yourist and Rosalie H. Yourist, husband and wife |
| Grantee/Beneficiary: | NorthStar Bank, N.A. |
| Trustee: | Stewart Title |
| Amount: | $1,125,000.00 |
| Recorded: | March 17, 2003 |
| Recording Information: | 20030317002642 |

Affects:             The land and other property.

23. The terms and provisions contained in the document entitled "Hazardous Substances Certificate and Indemnity Agreement" recorded March 17, 2003 as Recording No. 20030317002643 of Official Records.

24. This item has been intentionally deleted.

25. Deed of Trust and the terms and conditions thereof.
| | |
|---|---|
| Grantor/Trustor: | Harry Yourist and Rosalie Yourist |
| Grantee/Beneficiary: | Equilon Enterprises LLC, a limited liability company organized and existing under the laws of the State of Delaware |
| Trustee: | Stewart Title Company |
| Amount: | $265,000.00 |
| Recorded: | October 10, 2003 |
| Recording Information: | 20031010003931 |

*First American Title Insurance Company*

According to the public records, the beneficial interest under the deed of trust was assigned to Allied Fuel, LLC, a Washington limited liability company by assignment recorded November 8, 2011 as Recording No. 20111108001646 of Official Records.

(Affects Portion of Said Premises and Other Property)

26. A financing statement recorded November 10, 2009 as Recording No. 20091110000345 of Official Records.
   Debtor:
   Secured party:                      Harry R Yourist and Rosalie H Yourist
                                       Frontier Bank

   Affects:                           The land and other property.

27. This item has been intentionally deleted.

28. Easement, including terms and provisions contained therein:
   Recording Information:             May 17, 2010 under Recording No. 20100517000618
   In Favor of:                       The City of Shoreline
   For:                               Construction of a new sidewalk, driveways and utility undergrounding within the right of way
   Affects:                           as described therein

29. This item has been intentionally deleted.

30. This item has been intentionally deleted.

31. This item has been intentionally deleted.

32. This item has been intentionally deleted.

33. Unrecorded leaseholds, if any, rights of vendors and security agreement on personal property and rights of tenants, and secured parties to remove trade fixtures at the expiration of the term.

34. This item has been intentionally deleted.

35. This item has been intentionally deleted.

36. This item has been intentionally deleted.

37. This item has been intentionally deleted.

38. This item has been intentionally deleted.

39. This item has been intentionally deleted.

40. This item has been intentionally deleted.

41. This item has been intentionally deleted.

*First American Title Insurance Company*

42. This item has been intentionally deleted.

43. This item has been intentionally deleted.

44. This item has been intentionally deleted.

45. This item has been intentionally deleted.

46. This item has been intentionally deleted.

47. This item has been intentionally deleted.

48. Terms, covenants, conditions and restrictions as contained in recorded Lot Line Adjustment (Boundary Line Revision) SHLA-201854 :
Recorded:                          April 21, 2011
Recording Information:      20110421900001

49. This item has been intentionally deleted.

50. This item has been intentionally deleted.

51. Evidence of the authority of the individual(s) to execute the forthcoming document for Carter & Carter, LLC, a Washington limited liability company, copies of the current operating agreement should be submitted prior to closing.

52. This item has been intentionally deleted.

53. This item has been intentionally deleted.

54. This item has been intentionally deleted.

55. Warrant in favor of the State of Washington.
Against:                          Harry R. Yourist and Rosalie H. Yourist
Amount:                          $11,281.39, plus interest
Filed:                              January 12, 2012
Judgment/Warrant No.:    12-9-02846-5
Case/Cause No.:              12-2-01932-1
Department:                     Washington State Department of Revenue

56. Warrant in favor of the State of Washington.
Against:                          Harry R. Yourist and Rosalie H. Yourist
Amount:                          $6,462.28, plus interest
Filed:                              January 12, 2012
Judgment/Warrant No.:    12-9-02847-3
Case/Cause No.:              12-2-01933-9
Department:                     Washington State Department of Revenue

57. This item has been intentionally deleted.

*First American Title Insurance Company*

58.     This item has been intentionally deleted.

59.     This item has been intentionally deleted.

60.     This item has been intentionally deleted.

61.     This item has been intentionally deleted.

62.     This item has been intentionally deleted.

63.     General Taxes for the year 2013.
        Tax Account No.:                 072604-9110-07
        Amount Billed:              $        41,050.11
        Amount Paid:                $             0.00
        Amount Due:                 $        41,050.11
        Assessed Land Value:        $     2,555,800.00
        Assessed Improvement Value: $             0.00

        Affects:                    The land and other property.

64.     This item has been intentionally deleted.

## INFORMATIONAL NOTES

A.  Effective January 1, 1997, and pursuant to amendment of Washington State Statutes relating to standardization of recorded documents, the following format and content requirements must be met. Failure to comply may result in rejection of the document by the recorder.

B.  Any sketch attached hereto is done so as a courtesy only and is not part of any title commitment or policy. It is furnished solely for the purpose of assisting in locating the premises and First American expressly disclaims any liability which may result from reliance made upon it.

C.  If this preliminary report/commitment was prepared based upon an application for a policy of title insurance that identified land by street address or assessor's parcel number only, it is the responsibility of the applicant to determine whether the land referred to herein is in fact the land that is to be described in the policy or policies to be issued.

D.  The description can be abbreviated as suggested below if necessary to meet standardization requirements. The full text of the description must appear in the document(s) to be insured.

Ptn Parcel C, BLA No. SHLA-201854, Rec. 20110421900001

APN:  072604-9110-07

E.  According to the application for title insurance, title is to vest in Carter & Carter, LLC, a Washington limited liability company.

Examination of the records discloses no matters pending against said party(ies).

F.  A fee will be charged upon the cancellation of this Commitment pursuant to the Washington State Insurance Code and the filed Rate Schedule of the Company.

cc: Key Bank

**END OF SCHEDULE B**

*First American Title Insurance Company*

# EXHIBIT B

© Commercial Brokers
Association 2011
All Rights Reserved

CBA Form XS
Exclusive Sale Listing
Rev. 1/2011
Page 1 of 4

### EXCLUSIVE SALE LISTING AGREEMENT
CBA Text Disclaimer. Text deleted by licensee indicated by strike.
New text inserted by licensee indicated by small capital letters.

This Agreement is made by and between <u>Harry R. and Rosalie H. Yourist</u> ("Seller") and <u>Western Realty Advisors Inc</u> ("Firm"). Seller hereby grants to Firm the exclusive and irrevocable right to sell and to receipt for deposit in connection therewith, Seller's commercial real estate legally described as set forth on attached Exhibit A and commonly described as <u>19930 44th Avenue West</u>, City of <u>Lynnwood</u>, <u>Snohomish</u> County, Washington (the "Property").

**1.     DURATION OF AGREEMENT.** This Agreement shall commence on <u>August 2, 2013</u> and shall expire at 11:59 p.m. on <u>July 31, 2014</u>.

**2.     PRICE AND TERMS.** Seller agrees to list the Property at a price of <u>$1,600,000.00</u> and shall consider offers that include the following terms:
Possession: <u>Upon Closing</u>
Terms: <u>All Cash</u>

**3.     DEFINITIONS.** As used in this Agreement, (a) "CBA" shall mean the Commercial Brokers Association; and (b) "sell" shall mean sell, contract to sell, enter into a contract to sell, exchange, lease for over 5 years, and/or enter into an option to purchase the Property. The phrases "this Agreement" and "during the term hereof" include separate, written extensions or renewals of this Agreement.

**4.     AGENCY/DUAL AGENCY.** Seller authorizes Firm to appoint <u>Rob Chadek and Bill Chadek</u> as Seller's Listing Broker. This Agreement creates an agency relationship with Listing Broker and any of Firm's brokers who supervise Listing Broker's performance as Seller's agent ("Supervising Broker"). No other brokers affiliated with Firm are agents of Seller, except to the extent that Firm, in its discretion, appoints other brokers to act on Seller's behalf as and when needed.

If the Property is sold to a buyer represented by one of Firm's brokers other than Listing Broker ("Buyer's Broker"), Seller consents to any Supervising Broker, who also supervises Buyer's Broker, acting as a dual agent. If the Property is sold to a buyer who Listing Broker also represents, Seller consents to Listing Broker and Supervising Broker acting as dual agents. Seller has received from Listing Broker the pamphlet entitled "The Law of Real Estate Agency."

If any of Firm's brokers act as a dual agent, Firm shall be entitled to the entire commission payable under this Agreement plus any additional compensation Firm may have negotiated with the buyer.

**5.     PROPERTY OWNERSHIP AND INFORMATION.** Seller warrants that Seller has the right to sell the Property on the terms set forth in this Agreement and agrees to furnish and pay for a buyer's policy of title insurance showing marketable title to the Property. Seller also warrants that the Property information on the Property Information pages of this Agreement is correct. Seller understands that Firm and other members of CBA will make representations to prospective buyers based solely on the Property Information in this Agreement and agrees to indemnify and hold Firm and other members of CBA harmless in the event the foregoing warranties are incorrect. Seller confirms that following closing, the amount of the purchase price and any other terms of the sale of the Property shall not be deemed confidential information and Seller authorizes disclosure of the same. Seller acknowledges receipt of a copy of this Agreement, with the Property Information pages of this Agreement fully filled in.

© Commercial Brokers
Association 2011
All Rights Reserved

**CBA**

CBA Form XS
Exclusive Sale Listing
Rev. 1/2011
Page 2 of 4

## EXCLUSIVE SALE LISTING AGREEMENT
### (CONTINUED)

6.     **CLOSING COSTS.** In addition to purchasing a buyer's policy of title insurance, Seller agrees to pay one-half of any escrow fees. Rents, insurance, taxes, interest and reserves on assumed encumbrances are to be prorated between Seller and buyer as of the date of closing. A sale on real estate contract shall be on Form LP345, currently distributed by title insurance companies.

7.     **COMMISSION.** Firm shall be entitled to a commission if: (a) Seller sells the Property during the term of this Agreement; (b) Seller sells the Property within six months after the expiration or sooner termination of this Agreement to a person or entity that submitted an offer to purchase the Property during the term of this Agreement or that appears on any registration list provided by Firm pursuant to this Agreement or to an "Affiliate" of such a person or entity that submitted an offer or that appears on the registration list; (c) the Property is made unmarketable by Seller's voluntary act; or (d) Seller withdraws the Property from sale, or otherwise prevents Broker from selling it. The commission shall be calculated as follows: <u>Five percent (5%) of the total purchase price paid through escrow at closing.</u>

Firm shall submit any registration list to Seller within 15 days after the expiration or sooner termination of this Agreement and shall only include on the registration list persons or entities to whose attention the Property was brought through the signs, advertising or other action of Firm, or who received information secured directly or indirectly from or through Broker during the term of this Agreement. Seller shall provide the registration list to any other brokers that assist the Seller with this Property. "Affiliate" means, with respect to any person or entity that submitted an offer during the term of this Agreement or that appears on the registration list, any buyer which has more than a 10% ownership or voting interest in such an entity or any buyer in which more than 10% of the ownership or voting interests are owned or controlled by such a person or entity.

8.     **FIRM/MULTIPLE LISTING.** Firm shall cause this listing to be published by CBA for distribution to all CBA members through CBA's listing distribution systems. Firm shall cooperate with all other members of CBA in working toward the sale of the Property. Seller understands and agrees that all Property information contained in this Agreement or otherwise given to CBA becomes the Property of CBA, is not confidential, and will be given to third parties, including prospective buyers, other cooperating members of CBA who do not represent the Seller and, in some instances, may represent the buyer and other parties granted access to CBA's listing systems. Seller agrees that Firm may record this Agreement. Regardless of whether a cooperating member is the Firm of the buyer, the Seller, neither or both, the member shall be entitled to receive the selling office's share of the commission as designated by the listing office. IT IS UNDERSTOOD THAT CBA IS NOT A PARTY TO THIS AGREEMENT, AND ITS SOLE FUNCTION IS TO FURNISH THE DESCRIPTIVE INFORMATION SET FORTH IN THIS LISTING TO ITS MEMBERS, WITHOUT VERIFICATION AND WITHOUT ASSUMING ANY RESPONSIBILITY FOR SUCH INFORMATION OR IN RESPECT TO THIS AGREEMENT.

9.     **ATTORNEY'S FEES.** In the event either party employs an attorney to enforce any terms of this Agreement and is successful, the other party agrees to pay a reasonable attorney's fee and any costs and expenses incurred. In the event of trial, venue shall be in the county in which the Property is located, and the amount of the attorney's fee shall be as fixed by the court.

10.     **ADDITIONAL TERMS.** In addition to the Property Information pages of this Agreement and Exhibit A (legal description), the following amendments or addenda (which are also attached hereto) are part of this Agreement: <u>None</u>

® Commercial Brokers
Association 2011
All Rights Reserved

CBA Form XS
Exclusive Sale Listing
Rev. 1/2011
Page 3 of 4

CBA

## EXCLUSIVE SALE LISTING AGREEMENT
### (CONTINUED)

**SELLER**

_____
Seller/Authorized Signature

Title: _____

Date: _____

**FIRM**

Western Realty Advisors Inc, (Company)

By: _____
(Authorized Representative)

Date: ___7/15/13___

_____
Seller/Authorized Signature

Title: _____

Date: _____

© Commercial Brokers
Association 2011
All Rights Reserved

CBA Form XS
Exclusive Sale Listing
Rev. 1/2011
Page 4 of 4

**CBA** ✓

EXCLUSIVE SALE LISTING AGREEMENT
(CONTINUED)

EXHIBIT A
(Legal Description)

19930 44th Ave. W
Lynnwood, WA
CC#120839

PROPERTY DESCRIPTION:

THAT PORTION OF LOTS 14 AND 15, BLOCK 6, ALDERWOOD MANOR,
ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME 9 OF PLATS,
PAGE 71, RECORDS OF SNOHOMISH COUNTY, WASHINGTON, DESCRIBED AS
FOLLOWS:

(A) EAST 205 FEET OF SAID LOT 14, LYING NORTH OF 200TH STREET AS
CONVEYED TO SNOHOMISH COUNTY, WASHINGTON, BY QUIT CLAIM DEED
RECORDED UNDER AUDITOR'S FILE NUMBER 1831291 AND 8104220123;
EXCEPT THE EAST 55 FEET THEREOF;

(B) THE EAST 205 FEET OF THE SOUTH 75.91 FEET OF SAID LOT 15; EXCEPT
THE EAST 30 FEET THEREOF;
TOGETHER WITH PERPETUAL NON-EXCLUSIVE EASEMENT FOR INGRESS
AND EGRESS, OVER AND ACROSS THE FOLLOWING DESCRIBED TWO
PARCELS OF LAND:

(1) BEGINNING AT THE SOUTHWEST CORNER OF ABOVE-DESCRIBED
PARCEL A; THENCE NORTH 0°18'10" EAST 25 FEET; THENCE
SOUTHWESTERLY IN A STRAIGHT LINE TO A POINT ON NORTH LINE OF
200TH STREET THAT IS NORTH 88°06'36" WEST OF POINT OF BEGINNING;
THENCE SOUTH 88°06'36" EAST 25 FEET TO POINT OF BEGINNING.

(2) BEGINNING AT THE NORTHEAST CORNER OF ABOVE-DESCRIBED
PARCEL B; THENCE NORTH 0°18'10" EAST 25 FEET; THENCE
SOUTHWESTERLY IN A STRAIGHT LINE TO A POINT ON THE NORTH LINE
OF SAID PARCEL B THAT IS 25 FEET WEST OF POINT OF BEGINNING.
THENCE EAST 25 FEET TO POINT OF BEGINNING.

SITUATE IN THE COUNTY OF SNOHOMISH, STATE OF WASHINGTON.

# EXHIBIT C

{EXHIBI~1-1}

# SETTLEMENT AGREEMENT

This **SETTLEMENT AGREEMENT** ("Agreement") is made and entered into this __ day of September, 2013, by and between Harry R. Yourist and Rosalie H. Yourist (the "Debtors"), Yourist Enterprizes, Inc. ("Yourist Enterprizes"), and Wilson Oil, Inc. ("Wilson Oil") (collectively, the "Parties").

**WHEREAS**, Wilson Oil filed a lawsuit in King County Superior Court, Case No. 13-2-03650-9 SEA, against Debtors and Yourist Enterprizes ("the Lawsuit"); and

**WHEREAS**, Wilson Oil filed a proof of claim and amendment thereto [Claim No. 11] in the Debtors' bankruptcy case, Case No. 13-13512-KAO, consisting of: (1) a general unsecured claim in the amount of $261,488.70 regarding the Debtors' contractual obligations to Wilson Oil as to the Debtors' Westgate gas station, and (2) a general unsecured claim in the amount of $96,473.96 regarding Debtors' contractual obligations to Wilson Oil as to Debtors' Richmond Beach gas station.

**WHEREAS**, the Debtors, Yourist Enterprizes, and Wilson Oil desire to settle all of their respective claims against each other.

**NOW, THEREFORE**, the Parties agree, for the consideration and upon the terms set forth in this Agreement, that:

1.     **Assumption of Richmond Beach Executory Contract.** Debtors agree to assume the following (collectively, the "Richmond Beach Contract") regarding the Debtors' Richmond Beach gas station: (1) the Contract of Sale (Branded) Dealer Operating Agreement between the Debtors and Wilson Oil dated May 31, 2006, and addendum between the parties dated April 15, 2010; (2) the Commodity Schedule (Motor Fuels) between the Debtors and Wilson Oil dated May 31, 2006; (3) the Amortization Agreement between the Debtors and Wilson Oil dated May 31, 2006; and (4) the credit agreement between Debtors and Wilson Oil dated May 7, 2006. Debtors shall fully comply with and perform all of their commitments and obligations set forth in the Richmond Beach Contract. Wilson Oil's general unsecured claim in the amount of $96,473.96 regarding Debtors' contractual obligations to Wilson Oil as to Debtors' Richmond Beach gas station shall be deemed withdrawn upon confirmation of the Plan assuming the Richmond Beach Contract.

2.     **Allowance of Wilson Oil's Claim.** The Parties agree that Wilson Oil's general unsecured claim shall be allowed in the amount of $261,488.70 in Debtors' bankruptcy case, regarding Wilson Oil's claim as to the Westgate gas station. If Wilson Oil's claim has not been paid in full within eighteen months of the date of confirmation of the Plan, then Wilson Oil shall have all rights and remedies available under state law to pursue collection of its claim.

3.     **Stipulated Judgment Against Yourist Enterprizes.** Yourist Enterprizes hereby stipulates to judgment in favor of Wilson Oil in the principal amount of

1

$261,488.70 in the Lawsuit. Wilson Oil shall prepare and present such stipulated judgment in the Lawsuit. Wilson Oil agrees it will not execute on such judgment until eighteen months after confirmation of Debtors' Plan of Reorganization, provided that at such time it has not been paid in full on its general unsecured claim in Debtors' bankruptcy case. The claim in the Lawsuit by Wilson Oil against the Debtors shall be dismissed without prejudice, said claim being allowed in the Debtor's Bankruptcy Case.

4. **Releases.** Upon entry of the Bankruptcy Court's order approving this Agreement, either as incorporated in the Debtors' Plan of Reorganization or by separate motion, the Debtors and Yourist Enterprizes release, remise, and forever discharge Wilson Oil, its affiliates, officers, directors, employees, agents, attorneys, partners, successors, and assigns from any and all actions and causes of action, attorneys' fees, charges, claims, costs, demands, expenses, obligations, judgments, sums of money, debts, and liabilities, known or unknown, that they may have against any of those persons, whether past or present, regarding the Debtors' Westgate gas station and the Debtors' Richmond Beach gas station. Upon payment in full to Wilson Oil on its proof of claim and full satisfaction of all of the Debtors' obligations to Wilson Oil under the Richmond Beach Contract, Wilson Oil releases, remises, and forever discharges Debtors and Yourist Enterprizes, their affiliates, officers, directors, employees, agents, attorneys, partners, successors, and assigns from any and all actions and causes of action, attorneys' fees, charges, claims, costs, demands, expenses, obligations, judgments, sums of money, debts, and liabilities, known or unknown, that it may have against any of those persons, whether past or present, regarding the Debtors' Westgate gas station and the Debtors' Richmond Beach gas station.

5. **Incorporation into Debtors' Plan.** This Agreement shall be incorporated into Debtors' Plan of Reorganization.

6. **Bankruptcy Court Approval.** This Agreement is subject to approval by the United States Bankruptcy Court for the Western District of Washington, Seattle Division.

7. **Jurisdiction.** Any disputes arising in connection with this Agreement shall be adjudicated by the United States Bankruptcy Court for the Western District of Washington, Seattle Division.

8. **Original and Counterparts.** This Agreement may be executed in separate and identical counterparts, and transmitted electronically or via facsimile, each of which shall constitute an original, and all of which shall constitute a single agreement. It shall not be necessary, in making proof of this Agreement, to produce or account for more than one complete set of copies of counterparts.

9. **Entire Agreement.** This Agreement constitutes the entire agreement between the Parties with respect to the matters resolved herein. No amendment or modification to this Agreement shall be effective or binding upon any of the Parties unless in writing and duly executed by the Parties. In executing this Agreement, each

Party warrants it is relying solely upon his, her, or its own judgment and knowledge, as well as advice from their own legal counsel only, and is not relying on any statement or representation made by any of the other Parties or their agents or attorneys.

10. **Costs and Expenses.** Each Party shall bear and be responsible for the payment of its own fees and costs, including their own attorneys' fees, incurred in connection with the negotiation and preparation of this Agreement.

11. **Attorney's Fees.** In the event of any controversy or dispute between the Parties arising from or relating to this Agreement, including but not limited to enforcement of its terms or interpretation thereof, the prevailing party shall be entitled to recover from the losing party its reasonable attorney fees, expenses and costs.

12. **Construction.** The Parties acknowledge that each Party and its respective counsel have reviewed, commented on and approved this Agreement, and the rule of construction providing that ambiguities within the Agreement are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement.

IN WITNESS WHEREOF, the signatory hereto has executed this Agreement on this ___ day of September, 2013.


WILSON OIL, INC.

By: _____

Name: _____

Its: _____

_____
HARRY R. YOURIST

_____
ROSALIE H. YOURIST


YOURIST ENTERPRIZES, INC.

By: _____

Name: _HARRY R YOURIST_

Its: _Pres_

Party warrants it is relying solely upon his, her, or its own judgment and knowledge, as well as advice from their own legal counsel only, and is not relying on any statement or representation made by any of the other Parties or their agents or attorneys.

10. **Costs and Expenses.** Each Party shall bear and be responsible for the payment of its own fees and costs, including their own attorneys' fees, incurred in connection with the negotiation and preparation of this Agreement.

11. **Attorney's Fees.** In the event of any controversy or dispute between the Parties arising from or relating to this Agreement, including but not limited to enforcement of its terms or interpretation thereof, the prevailing party shall be entitled to recover from the losing party its reasonable attorney fees, expenses and costs.

12. **Construction.** The Parties acknowledge that each Party and its respective counsel have reviewed, commented on and approved this Agreement, and the rule of construction providing that ambiguities within the Agreement are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement.

IN WITNESS WHEREOF, the signatory hereto has executed this Agreement on this ___ day of September, 2013.

WILSON OIL, INC.

By: _Jason L. Mellema_

Name: _Jason L. Mellema_

Its: _Vice President_

_____

HARRY R. YOURIST

_____

ROSALIE H. YOURIST

YOURIST ENTERPRIZES, INC.

By: _____

Name: _____

Its: _____

3